COURT OF APPEALS
DECISION
DATED AND FILED

December 6, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP975**

Cir. Ct. No. **2012GN183**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

IN THE MATTER OF THE GUARDIANSHIP
AND PROTECTIVE PLACEMENT OF S. F. L.:

BROWN COUNTY,

    PETITIONER-RESPONDENT,

  V.

S. F. L.,

    RESPONDENT-APPELLANT.

        APPEAL from an order of the circuit court for Brown County: TIMOTHY A. HINKFUSS, Judge. *Affirmed*.

        Before Stark, P.J., Hruz and Gill, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. "Stanley"[1] appeals an order continuing his protective placement under WIS. STAT. ch. 55. He argues that Brown County failed to present sufficient evidence supporting the order. Additionally, Stanley argues that the circuit court erred by not making specific factual findings on the record regarding his incompetence. We disagree and therefore affirm the court's order.

## BACKGROUND

¶2 Stanley has been subject to guardianship and protective placement orders since 2012 and 2013, respectively. Stanley was originally placed in a locked unit because of "safety" concerns. In June 2015, however, Stanley moved to a licensed adult family home. In July 2016, Stanley moved to a community-based residential facility (CBRF)—his placement at the time of this appeal.

¶3 In December 2020, the County filed another petition to continue Stanley's protective placement at the CBRF. As part of this process, both Sheila DeGrand, with the Brown County Health and Human Services Department, and Dr. Bradley Allen interviewed Stanley, and their resulting reports were filed with the circuit court and later admitted into evidence.

¶4 Stanley contested the continuation of his protective placement at the CBRF, and the circuit court held a hearing on the petition. The County called Dr. Allen and DeGrand as witnesses. Allen testified that Stanley "has been diagnosed in the past with schizophrenia" and "[m]ore recently [with]

---

[1] For ease of reading, we use a pseudonym in this confidential matter when referring to the appellant, S.F.L. *See* WIS. STAT. RULE 809.81(8) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

2

schizophrenia affective disorder." Both witnesses recommended that protective placement continue at the CBRF because it was the least restrictive environment for Stanley. DeGrand described the services that Stanley received at the CBRF, and she testified that Stanley receives "nursing care due to diabetes that requires blood monitoring as well as medications for his mental illness. He also has staff that arrange medical appointments for him and arrange transportation to those appointments to ensure he makes them. He also has meals provided for him."

¶5 Both witnesses also testified regarding Stanley's leg amputations below the knee, which were necessitated because of infections resulting from Stanley's self-neglect. According to DeGrand, the infections started in 2011 and 2012, respectively, and at least one of the infections occurred while Stanley was "in a supported apartment setting [around] the time the guardianship was started." According to DeGrand, Stanley had "somehow or another … gone off his medications or declined to take them." DeGrand further testified that, according to some "reports," Stanley was "pouring urine on [his leg wounds] which caused them to become worse." Stanley was also malnourished at the time of at least one of the amputations, according to DeGrand.

¶6 Stanley also testified. He explained that his primary objective was to live in his own apartment. Stanley testified that he could do many daily tasks on his own, including transferring from his wheelchair, cooking for himself, and conducting his own blood sugar testing. At the close of the evidence, Stanley's court-appointed guardian ad litem (GAL) recommended continued protective placement at the CBRF.

¶7 The circuit court ultimately ordered continued protective placement at the CBRF. Specifically, the court found that Stanley "does meet the

standards … for the placement. I do find [the CBRF] is the least restrictive place that he has and that he's residing at." In making its ruling, the court referenced Stanley's amputations and said that it "goes to show that he does need this restrictive placement." The court explained that it was continuing Stanley's placement at the CBRF because: (1) the placement provided Stanley with his medication; (2) it brought him to his appointments and reminded him when the appointments were scheduled; (3) it monitored his blood sugar three times a day; and (4) it provided Stanley with nutritional meals.

¶8 Stanley now appeals. Additional facts will be provided below as necessary.

## DISCUSSION

¶9 A county seeking an order for protective placement over an individual must satisfy the requirements of WIS. STAT. § 55.08(1) by clear and convincing evidence. WIS. STAT. § 55.10(4)(d). An annual review of the protective placement must take place if the county continues to seek protective placement. WIS. STAT. § 55.18(1)(a); *State ex rel. Watts v. Combined Cmty. Servs. Bd.*, 122 Wis. 2d 65, 84, 362 N.W.2d 104 (1985) ("We hold that there must be an annual review of each protective placement by a judicial officer.").

¶10 To continue protective placement each year, a county must again satisfy the requirements in WIS. STAT. § 55.08(1). *See* WIS. STAT. § 55.18(3)(e). As relevant here, if an individual subject to a protective placement continuation desires an evidentiary hearing, a *Watts* hearing must be held. *See* § 55.18(3)(d); *Watts*, 122 Wis. 2d at 85 ("A full due process hearing should be required whenever the protectively placed individual … requests it.").

¶11 A circuit court's factual findings at a *Watts* hearing "will not be overturned unless clearly erroneous." *See Walworth County v. Therese B.*, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377 (citation omitted). "An appellate court will search the record for evidence to support the [circuit] court's findings of fact," *Fond du Lac County v. J.G.S., Jr.*, 159 Wis. 2d 685, 687-88, 465 N.W.2d 227 (Ct. App. 1990), "not for evidence to support findings the court could have reached but did not," *Noble v. Noble*, 2005 WI App 227, ¶15, 287 Wis. 2d 699, 706 N.W.2d 166. "The issues of whether the evidence satisfies the legal standard for incompetency and whether the evidence supports protective placement are questions of law, which we review *de novo*." *Therese B.*, 267 Wis. 2d 310, ¶21 (citation omitted).

¶12 Stanley argues on appeal that the County failed to meet its burden of proof to continue his protective placement. Specifically, Stanley contends the County failed to show by clear and convincing evidence that he met the requirements of WIS. STAT. § 55.08(1),[2] which, in relevant part, states that a court may order protective placement for an individual who meets all of the following standards:

> (a) The individual has a primary need for residential care and custody.
>
> (b) The individual … is an adult who has been determined to be incompetent by a circuit court.
>
> (c) As a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create

---

[2] Stanley concedes that the County met its burden of proving that he "has a disability that is permanent or likely to be permanent." *See* WIS. STAT. § 55.08(1)(d).

a substantial risk of serious harm to himself or herself or others. Serious harm may be evidenced by overt acts or acts of omission.

¶13 The problem with most of Stanley's appellate arguments is that he is essentially asking us to reweigh the evidence as if we were the circuit court. However, as noted above, our review of factual findings on appeal is limited to determining whether a circuit court's factual findings were clearly erroneous; we do not reweigh the evidence presented to a circuit court. *Dickman v. Vollmer*, 2007 WI App 141, ¶14, 303 Wis. 2d 241, 736 N.W.2d 202.

## I. WISCONSIN STAT. § 55.08(1)(a): Primary need for residential care and custody

¶14 Stanley first argues that the County failed to show that he "ha[d] a primary need for residential care and custody." *See* WIS. STAT. § 55.08(1)(a). "[P]rimary need for residential care and custody" means "the person must have a primary need (1) to have his or her daily needs provided for in a residential setting; and (2) to have someone else exercising control and supervision in that residential setting for the purpose of protecting the person from abuse, financial exploitation, neglect, and self-neglect." *Jackson Cnty. Dep't of Health & Hum. Servs. v. Susan H.*, 2010 WI App 82, ¶16, 326 Wis. 2d 246, 785 N.W.2d 677.

¶15 In support of his position, Stanley points to his testimony during the *Watts* hearing, as well as that of Dr. Allen. For example, Allen testified that Stanley had "been doing well. He actually is active. He participates in activities." Allen also testified that Stanley was stable, did not have "behavioral issues," and was "managing his emotions and interactions adequately." Stanley testified that he normally did his own diabetes testing, maneuvered in and out of his wheelchair on his own, and could cook for himself.

¶16     We disagree with Stanley that the County failed to meet its burden as to WIS. STAT. § 55.08(1)(a). We first note that Stanley's citations to Dr. Allen's testimony are taken out of context. While Allen did testify that Stanley was "doing well," Stanley fails to account for the rest of Allen's testimony, in which Allen stated: "Given [Stanley's] history however, I would be concerned for him being alone for any length of time and/or I would be concerned about him going into the community [and] for him to engage in activities that are not within his ability or that he's capable of." Allen further testified that during his examination of Stanley, Stanley scored in the "severe … deficit range" for his immediate memory. Allen testified that he was concerned over Stanley cooking on his own. Allen testified that while he could not definitively say what Stanley could safely cook, Stanley "exhibits some difficulties with attention and planning so [he could] perhaps [do] simple meal preparation."

¶17     Doctor Allen's report, which was received into evidence, also outlined Stanley's need for supervision and his inability to provide for his own daily needs. In it, Allen noted that "[d]ue to [Stanley's] physical limitations and medical needs … [he] requires significant assistance with his activities of daily living including medication and medical treatment/management." Further, due to Stanley's amputations, he "requires assistance/monitoring with many activities of daily [tasks] including toileting, dressing, bathing, transferring [to and from his wheelchair], meals, housekeeping, medication/diabetic management, safety, and medical care." As such, Allen concluded in his report that Stanley was in need of twenty-four-hour supervision, in a secured setting with monitored egress, and on-site skilled nursing care.

¶18     Stanley also ignores DeGrand's testimony regarding Stanley's need for someone to provide for his daily needs and supervise him to prevent

self-neglect. For example, DeGrand testified that Stanley receives numerous services at the CBRF that provide for his daily needs, including prepped meals, "nursing care due to diabetes that requires blood monitoring as well as medications for his mental illness," and medical appointment booking. DeGrand also testified that Stanley consistently expressed "that he has no desire to take medications and he would like to discontinue taking medications." DeGrand testified that Stanley's refusal to take medications in the past resulted in the need to amputate Stanley's legs.

¶19 Moreover, DeGrand reported that Stanley "requires assistance with [activities of daily living] such as bathing and dressing. He is mostly independent with grooming and toileting but is incontinent of bowel at times." Further, Stanley ignores the fact that DeGrand testified that, at times, Stanley "does require staff assistance with [wheelchair] transfer." Given the testimony from both of the County's witnesses, the County met its burden of proof as to WIS. STAT. § 55.08(1)(a).

## II. WISCONSIN STAT. § 55.08(1)(b): Incompetence

¶20 Stanley next argues that the circuit court did not make a finding regarding his incompetency, as required under WIS. STAT. § 55.08(1)(b).[3] In his reply brief, Stanley compares the finding of incompetency for purposes of a continuation of protective placement to the finding of dangerousness in a

---

[3] The circuit court did not expressly address WIS. STAT. § 55.08(1)(b) in its oral ruling. That said, the court did address the element in its written order titled, "Findings and Order Continuing Protective Placement/Order for Protective Services (Annual Review of Protective Placement)," using a standard court form: Form GN-4120 (May 2018). We deem the court's finding under § 55.08(1)(b) via the written order adequate, although not ideal. *See* WIS. STAT. § 805.17(2) ("If an opinion or memorandum of decision is filed, it will be sufficient if the findings of ultimate fact and conclusions of law appear therein."); *see also infra* ¶¶24-25.

recommitment proceeding under WIS. STAT. ch. 51. In ***Langlade County v. D.J.W.***, 2020 WI 41, ¶43, 391 Wis. 2d 231, 924 N.W.2d 277, our supreme court ruled that in a recommitment proceeding, circuit courts must make "specific factual findings with reference to the [dangerousness] subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which [a] recommitment is based."[4] According to Stanley, WIS. STAT. ch. 55 proceedings must operate like ch. 51 proceedings in this regard.

¶21 We agree that a circuit court is required to make specific findings with regard to incompetency. An individual is incompetent for purposes of WIS. STAT. § 55.08(1)(b) when a petitioner proves by clear and convincing evidence that the elements in WIS. STAT. § 54.10(3)(a)[5] are met:

> 1. The individual is aged at least 17 years and 9 months.
>
> 2. For purposes of appointment of a guardian of the person, because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the individual is unable to meet the essential requirements for his or her physical health and safety.
>
>   ….

---

[4] We note that Stanley first developed this argument with reference to ***Langlade County v. D.J.W.***, 2020 WI 41, 391 Wis. 2d 231, 924 N.W.2d 277, in his reply brief. Therefore, the County did not have an opportunity to respond specifically to that argument. Under these circumstances, we could refuse to consider the argument. *See **A.O. Smith Corp. v. Allstate Ins. Cos.***, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) (court of appeals generally does not address arguments raised for the first time in a reply brief). That said, because we ultimately conclude that the circuit court did make the requisite factual findings, we will address this argument.

[5] WISCONSIN STAT. § 54.10(3)(a)3. is only applicable to incompetency determinations "[f]or purposes of appointment of a guardian of the estate." As the County points out on appeal, § 54.10(3)(a)3. does not apply to Stanley because he has no guardianship of his estate.

> 4. The individual's need for assistance in decision making or communication is unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, a supported decision-making agreement under [WIS. STAT.] ch. 52, or other means that the individual will accept.

"'Impairment' means a developmental disability, serious and persistent mental illness, degenerative brain disorder, or other like incapacities." WIS. STAT. § 54.01(14).

¶22    As expressly provided in WIS. STAT. § 54.10(3)(a), a circuit court may find that an individual is incompetent "*only if* the court finds by clear and convincing evidence that all of the [subdivisions in § 54.10(3)(a)] are true." (Emphasis added.)    Put differently, the subdivisions in § 54.10(3)(a) are the ultimate facts needed to find a person incompetent. *See ultimate fact*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A fact essential to the claim or the defense."). Significantly, in all matters tried without a jury, a court "shall find the ultimate facts and state separately its conclusions of law thereon." WIS. STAT. § 805.17(2).

¶23    Like our supreme court stated with regard to specific dangerousness findings, specific incompetency findings "will clarify issues raised on appeal … and ensure the soundness of judicial decision making, specifically with regard to challenges based on the sufficiency of the evidence." *See **D.J.W.***, 391 Wis. 2d 231, ¶44.    When a circuit court makes specific findings regarding incompetence, we avoid "conflicting messages from the County and the [court] regarding the statutory basis for this [protective placement]." *See **id.***, ¶40. Similarly, as Stanley argues on appeal, like in a recommitment proceeding, there are "important liberty interest[s] at stake" in protective placement proceedings, which favors requiring specific factual findings of incompetence in order to

"provide[] increased protection to patients" so that protective placements "are based on sufficient evidence." *See id.*, ¶¶42-43.

¶24    That said, we reject Stanley's argument that the circuit court in this case failed to make specific factual findings as to his incompetence. The court did address incompetency in its written order. *See supra* note 3. There, the court stated that, "[a]s a result of [a] serious and persistent mental illness[, Stanley] is so totally incapable of providing for [his] own care or custody to create a substantial risk of serious harm to [himself] or others." Furthermore, the court stated that Stanley "has a disability that is permanent or likely to be permanent." Therefore, the court's findings under WIS. STAT. § 55.08(1)(b) via the written order are minimally sufficient. *See* WIS. STAT. § 805.17(2).

¶25    While the circuit court made the minimum factual findings required, we urge courts to make more detailed findings on the record for two reasons. First, as we noted previously, there are "important liberty interest[s] at stake" in protective placement orders. *See D.J.W.*, 391 Wis. 2d 231, ¶43. "Freedom from physical restraint is a fundamental right that has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Id.*, ¶42 (citations omitted). Like hearings under WIS. STAT. ch. 51, hearings to continue protective placement "cannot be perfunctory under the law. Attention to detail is important." *See Outagamie County v. Melanie L.*, 2013 WI 67, ¶94, 349 Wis. 2d 148, 833 N.W.2d 607 (discussing involuntary medication orders). Second, also noted earlier, specific factual findings will clarify issues raised on appeal, particularly when an appeal is based on the sufficiency of the evidence. *See D.J.W.*, 391 Wis. 2d 231, ¶44.

11

¶26    Stanley next argues that the County failed to meet its burden of showing that he was incompetent under WIS. STAT. § 55.08(1)(b).[6]  Under WIS. STAT. § 54.10(3), the County was required to prove that Stanley suffers from an "impairment," which is defined by WIS. STAT. § 54.01(14) as including a "serious and persistent mental illness."  "Serious and persistent mental illness" is defined as including schizophrenia.  Sec. 54.01(30).  At the *Watts* hearing, Dr. Allen testified that Stanley had been diagnosed with schizophrenia affective disorder—which Allen defined in his report as a "serious and persistent mental illness."  DeGrand also noted in her report that Stanley suffered from schizophrenia.  On this record, the County clearly met its burden to show that Stanley suffered from at least one impairment.

¶27    The County was also required to prove that, because of an impairment, Stanley was "unable effectively to receive and evaluate information or to make or communicate decisions."  *See* WIS. STAT. § 54.10(3)(a)2.  Stanley cites to Dr. Allen's testimony to show that he could effectively receive and evaluate information and communicate decisions.  Stanley again takes Allen's testimony out of context.  Allen did testify that Stanley had "been doing well.  He actually is active.  He participates in activities[,]" and that Stanley did not exhibit "behavioral issues" and was "managing his emotions and interactions adequately."  Stanley also cites to his testimony at the *Watts* hearing for his proposition that the County did not meet its burden to show that he could not effectively receive and evaluate information or communicate decisions.  For example, Stanley testified

---

[6] Stanley does not expressly concede that the County proved that he was older than seventeen years and nine months, but both Dr. Allen's report and DeGrand's report noted Stanley's birthdate which clearly shows that Stanley meets the age requirement.  Both of these reports were admitted into evidence.  Therefore, the County met its burden as to this element.

that he understood his medical needs and demonstrated this understanding by testifying that he schedules his medical appointments. As the County argues on appeal, Stanley offers no nexus between this testimony and the statutory requirement that he could effectively receive and evaluate information or communicate decisions. In other words, the testimony Stanley cites to does not equate to the County failing to meet its burden. Simply because Allen testified that Stanley is, for example, active, does not mean that the County failed to demonstrate that Stanley is "unable effectively to receive and evaluate information or to make or communicate decisions."

¶28 Stanley's reliance on his own testimony at the *Watts* hearing does not lead us to conclude that the County failed to meet its burden under WIS. STAT. § 54.10(3)(a)2. In fact, the County met its burden based on Dr. Allen's testimony and report. Allen testified about Stanley's problems with receiving and evaluating information or communicating decisions, stating that Stanley scored in the "severe … deficit range" for his immediate memory. Allen's report specifically states that Stanley's mental illness interferes with his ability to receive and evaluate information. Additionally, Allen testified that Stanley expressed "some mild perhaps delusional thinking, some grandiosity, perception that he is able to function at a high[er]-level than he truly is." The circuit court gave more credibility and weight to Allen's testimony and his report's findings. These credibility findings are supported by the record and therefore not clearly erroneous.

¶29 As to the last element of incompetency—i.e., that Stanley's need for assistance in decision making or communication is unable to be met through alternative means, *see* WIS. STAT. § 54.10(3)(a)4.—Stanley argues that he testified that he would be open to support services assisting him at a placement less

restrictive than a CBRF. But both Dr. Allen and DeGrand opined that such services would not be enough. Specifically, Allen's report stated that "[d]ue to the severity of [Stanley's] limited insight/judgment, less restrictive interventions would not adequately provide for his safety and personal needs." Allen further testified that he would "be concerned [with Stanley] being alone for any length of time." Further, DeGrand testified that due to Stanley's desire not to take his medication, support services would not be adequate because those services do not ensure that a patient takes his or her medications.

¶30     The circuit court clearly found Dr. Allen and DeGrand more credible than Stanley because the court ordered the protective placement to continue, and it stated that Stanley met "the standards … for the placement," also making that factual finding in its written order. The court's credibility finding is supported by the record and thus not clearly erroneous. Given the testimony and reports from both Allen and DeGrand, the County proved by clear and convincing evidence that Stanley was incompetent.

## III.   WISCONSIN STAT. § 55.08(1)(c): Incapacity to provide for own care or custody

¶31     The County was also required to prove, by clear and convincing evidence, that Stanley met the standard under WIS. STAT. § 55.08(1)(c). In part, this standard required the County to prove that due to Stanley's mental illness, he was incapable of his own care or custody as to create a substantial risk of harm to himself or others. The term "care" in § 55.08(1)(c) "means that the person's incapacity for his or her daily needs creates a substantial risk of serious harm to the person or others." *Susan H.*, 326 Wis. 2d 246, ¶17. In addition, the word "[c]ustody" means "that the person cannot provide for himself or herself the

protection from abuse, financial exploitation, neglect, and self-neglect that the control and supervision by others can provide." ***Id.***

¶32 Relying upon his own testimony, Stanley again argues that the County failed to establish, by clear and convincing evidence, that he could not care for himself. Once again, Stanley fails to acknowledge Dr. Allen's testimony that Stanley could not provide for his own care or custody "primarily because of his need for support in conjunction with limited insight." Specifically, Allen testified that Stanley needed assistance with his wheelchair and general daily living. DeGrand also testified about Stanley's need for assistance with daily living, including assistance with his wheelchair, blood sugar monitoring, transportation for appointments, and assistance with his medications.

¶33 While the circuit court did not make specific factual findings in its oral ruling as to this element, it did order the protective placement and made the requisite findings in its signed order. Given the evidence before the court, the County met its burden of demonstrating that Stanley could not provide for his own care or custody.

¶34 Stanley further contends that even if the County adequately demonstrated that he could not provide care or custody for himself, the County failed to meet its burden of demonstrating that there was a "substantial risk of serious harm to himself … or others" because of that inability to provide care or custody for himself. *See* WIS. STAT. § 55.08(1)(c). According to Stanley, the County relied solely on his 2011 and 2012 amputation incidents to meet its burden of demonstrating risk under § 55.08(1)(c). Stanley phrases the question as "whether [Stanley's] act/omission from back in 2012 can indefinitely satisfy the

[C]ounty's burden and indefinitely prevent [Stanley] from living more independently." He asserts that "[t]he answer to that question has to be 'no.'"

¶35    Under WIS. STAT. § 55.08(1)(c), the potential harm at issue "may not be based on mere speculation but must be directly foreseeable from the overt acts or omissions of the individual." ***K.N.K. v. Buhler***, 139 Wis. 2d 190, 202, 407 N.W.2d 281 (Ct. App. 1987). Here, the County relied on more than the evidence of Stanley's amputations.

¶36    In addition to the 2011 and 2012 amputations, the County provided evidence that Stanley posed a "substantial risk of serious harm to himself" due to his inability to provide for himself. Namely, DeGrand testified that Stanley "decompensate[d]" two years ago after his medications "were changed a little bit." Further, as stated previously, DeGrand testified that Stanley had told her that he would like to stop taking his medications and that this failure could become a reality if he were placed in an independent setting. According to DeGrand, the last time Stanley was in an independent apartment setting with support, he suffered one of the leg amputations due to self-neglect after he stopped taking his medications. Therefore, contrary to Stanley's assertion, the County did not rely solely on the amputations to prove this element—it relied on the fact that Stanley could easily fall into the same serious health pitfalls that he did in 2011 and 2012 because he still had a desire to stop taking his medications in 2021. The evidence provides more than "mere speculation" of serious harm, and it is "directly foreseeable" that if Stanley were placed in an independent apartment or was not protectively placed, a substantial risk of serious harm would occur to himself.

**IV. WISCONSIN STAT. § 55.12(3): Least restrictive environment**

¶37    Lastly, Stanley argues that the County failed to show by clear and convincing evidence that his placement at a CBRF was the least restrictive environment.  *See* WIS. STAT. § 55.12(3) ("Protective placement … shall be provided in the least restrictive environment and in the least restrictive manner consistent with the needs of the individual to be protected and with the resources of the county department."); *see also* WIS. STAT. § 55.18(3)(e)1.

¶38    Instead, Stanley argues that the least restrictive environment would have been an independent living situation with assistance.  In support of this proposition, Stanley cites to the same testimony that he has repeatedly cited in support of prior arguments—e.g., that Stanley can take care of himself and to the extent he required assistance, that he would welcome help at an independent apartment.  Stanley also relies on his testimony stating that Lakeland Care[7] told him that if he lived independently, it would send someone to spend time with him for "four hours a day, seven days a week."

¶39    Again, Stanley ignores our standard of review—i.e., we accept the circuit court's findings of fact unless they are clearly erroneous.  Here, the court found that Stanley's current CBRF placement was the least restrictive placement required because the staff:  (1) provided Stanley with his medication; (2) reminded him of and brought him to his appointments; (3) monitored his blood sugar three times a day; and (4) provided Stanley with nutritional meals.  These findings are not clearly erroneous because they are supported by the testimony of Dr. Allen and

---

[7] Lakeland Care employed Stanley's case manager.  Stanley testified that Lakeland Care provided him with "door to door" appointments and transportation to his appointments.

DeGrand. Based on these findings, the County met its burden to show, by clear and convincing evidence, that the CBRF was the least restrictive environment for Stanley.

¶40 Stanley also ignores the evidence that was contrary to his testimony and that the circuit court found more persuasive. For example, while Dr. Allen testified that it would be possible for Stanley to live on his own at some point, Allen also testified that Stanley's current placement was the least restrictive environment. This opinion was also noted in Allen's report. DeGrand similarly testified, consistent with her report, that Stanley's current placement was the least restrictive and that a "step-down" from a CBRF was not appropriate at that time. One reason for her opinion was Stanley's desire not to take his medication— DeGrand explained that support services do not "sit and watch" patients take medications—and her concern that Stanley would decompensate after not taking his medications. As noted above, DeGrand also testified that the last time Stanley was in a supported apartment setting, he went off of his medications, suffered from an infection in his leg that led to amputation, and became malnourished.

¶41 For the reasons stated, we affirm the order continuing Stanley's protective placement.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.