Daniel Dickman,
Plaintiff-Appellant-Cross-Respondent,

v.

Ted K. Vollmer and Mixair Technologies, Inc.,
Defendants-Respondents-Cross-Appellants.

Court of Appeals

*No. 2006AP542. Submitted on briefs March 5, 2007.
—Decided May 9, 2007.*

2007 WI App 141

(Also reported in 736 N.W.2d 202.)

On behalf of the plaintiff-appellant-cross-respondent, the cause was submitted on the briefs of *Roberta N. Puntillo*, of *Godin, Geraghty & Puntillo, S.C.* of Kenosha.

On behalf of the defendant-respondent-cross-appellant, Ted K. Vollmer, the cause was submitted on the briefs of *Terry E. Nilles*, of *von Briesen & Roper, S.C.*, of Milwaukee.

On behalf of the defendant-respondent-cross-appellant, Mixair Technologies, Inc., the cause was submitted on the briefs of *Charles P. Magyera*, of *Gonzalez, Saggio & Harlan, L.L.P.*, of Milwaukee.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

¶ 1. NETTESHEIM, J. This case began as an action for dissolution of a corporation. Daniel Dickman appeals the judgment dismissing his complaint against Ted Vollmer and MixAir Technologies, Inc., the corporation Dickman and Vollmer founded. Claiming that Vollmer controlled MixAir in an illegal, oppressive and fraudulent manner, Dickman sought to dissolve MixAir and to have himself appointed as receiver for winding up its affairs.

¶ 2. The trial court concluded that Dickman was not entitled to have MixAir judicially dissolved and dismissed his complaint. It also dismissed Vollmer's and MixAir's counterclaims against Dickman for breach of fiduciary duty, breach of contract, conversion and for an accounting, and declared that Vollmer likewise had breached no fiduciary obligations. Finally, the court

ordered specific performance of a patent assignment to MixAir that it found the parties had orally agreed to.

¶ 3. The main issue on appeal is whether a written agreement between the parties covers the assignment to MixAir of their jointly held patent.[1] We uphold the trial court's findings that the parties orally agreed to assign the patent, however, and therefore affirm the judgment enforcing the assignment. We also affirm the dismissal of Dickman's complaint. Accordingly, we need not address Vollmer's and MixAir's "protective" cross-appeal, in which they ask us to reverse the trial court's holding that Dickman was not in breach of the written agreement and to remand that issue for further determination.

¶ 4. Finally, we commend the trial court on its thorough decision. Embraced within its thirty-nine pages are 141 findings of fact. We incorporate and adopt the trial court's decision on all issues we do not address. *See* WIS. CT. APP. IOP VI(5)(a) (Nov. 1, 2006) (court of appeals may adopt trial court's written opinion).

## BACKGROUND

¶ 5. Dickman and Vollmer jointly invented a new type of "diffuser," a device to aerate and purify ponds. In 1997, they applied for a patent and entered into a written agreement on sharing (1) patent fees; (2) expenses related to the diffuser's development, manufacture, sales and marketing; and (3) profits.[2] The agree-

---

[1] Since MixAir's appellate arguments largely track Vollmer's, we address them together.

[2] The 1997 written agreement provides:

This agreement between Ted K. Vollmer (individual) and Daniel H. Dickman (individual) is for the purpose of marketing a diffuser that has been jointly developed by them. The patent has been

ment provided that changes to it had to be in writing and approved by both parties. It did not address an assignment of a patent and no later writing modified the agreement. As agreed, Vollmer paid the first $2000 in patent fees.

¶ 6.   In April 1998, Dickman and Vollmer incorporated MixAir to more effectively market and sell the diffuser without competing with each other. Vollmer and his family members and Dickman split MixAir's voting stock equally two ways.[3] Dickman owns Recyclemate, Inc., and In Situ Solutions, Inc.; Vollmer and his family own several other companies, among them

applied for at the present time. It also covers future jointly developed designs weather [sic] patented or not.

Mr. Vollmer will pay the initial diffuser patent fees up to $2000.00, after which any additional fees will be shared equally.

Mr. Vollmer and Mr. Dickman will share equally the developmental expenses, manufacturing expenses, sales and marketing expenses, and profits forth coming from this diffuser.

With this agreement, Great Lakes Bio systems, Inc. and Recyclemate Inc. are issued a permanent license agreement to market and manufacture and sell this diffuser.

On decisions for other licensing, manufacturing, and selling agreements, Mr. Dickman will carry the deciding vote. This remains in effect until his demise or incompetence as deemed by a court of law at which time Mr. Vollmer will have the deciding vote.

This agreement remains in effect whether a patent is issued for this design or subsequent jointly developed designs or not.

When either party dies, all of that party's proceeds go to their respective heirs.

Any changes to this agreement will be in writing and approved by both parties or their heirs.

[3] Dickman's brother John originally handled marketing for MixAir and was a twenty percent voting shareholder but after about a year sold fifteen percent of his ownership to MixAir, retaining five percent non-voting stock.

Great Lakes Bio Systems. The 1997 agreement had granted Recyclemate and Bio Systems a permanent license to manufacture, market and sell the diffuser. The plan was for the diffuser to be manufactured by Recyclemate, sold to MixAir at near cost, and marketed by Bio Systems and In Situ as MixAir distributors under a favorable pricing structure called "principal pricing."

¶ 7. In 2001, a patent on the diffuser was issued jointly to Dickman and Vollmer. Vollmer maintains that when MixAir was incorporated, he and Dickman orally agreed that MixAir would "end[] up with the patent" on the diffuser, but nothing ever was reduced to writing because they had a good relationship. Vollmer testified that they agreed to the eventual assignment in return for shares of voting stock and MixAir's agreement to fund continued prosecution of the patent and to pay Dickman and Vollmer royalties of five percent of the proceeds from diffuser sales. Ron Brockman, their patent attorney, testified that he had had no patent assignment discussions with either Dickman or Vollmer and was unaware of an assignment. Dickman denies agreeing to assign the patent, but acknowledged the royalty agreement. Dickman also "[did not] have a problem with MixAir having paid" $30,243 of the total $40,167 in patent fees, while he and Vollmer paid approximately $2500 and $7300, respectively. Dickman contributed no equity capital to MixAir apart from the assignment agreement that he now disputes.

¶ 8. Although Dickman denies assigning or agreeing to assign the patent, he admits signing distributor agreements on MixAir's behalf indicating that MixAir owned patents and other intellectual property. Also, Vollmer and Dickman both testified that they told Jon Jay, the attorney for Sentry Insurance, MixAir's general

liability insurer, that they had assigned the patent to MixAir. A letter from Sentry to Vollmer and copied to Jay reflects that understanding. Dickman acknowledged that he did so to get insurance coverage in a patent-infringement suit against him and Vollmer personally, but said he later advised Jay that he misspoke. Sentry paid approximately $240,000 to defend the claims against them.

¶ 9. MixAir initially did not profit as anticipated. Loan accounts in the names of Vollmer, Dickman and several of their family members were created to finance the shortfall. The parties made other efforts, such as charging MixAir for the full cost of rent, labor and materials, but MixAir again required additional cash infusions in the form of loans. Vollmer testified that he and his family and their companies would not have continued to extend credit to MixAir or paid patent prosecution expenses had there been no agreement to assign the patent.

¶ 10. Relations between Dickman and Vollmer soured, and in late 2003 Dickman filed this action against Vollmer and MixAir. Dickman sought to have MixAir dissolved and have himself appointed as receiver pursuant to WIS. STAT. §§ 180.1430 and 180.1432 (2005–06).[4] He alleged that Vollmer controlled MixAir in an illegal, oppressive and fraudulent manner, misapplied and wasted corporate assets, and breached his fiduciary duties. Vollmer and MixAir counterclaimed for breach of contract and conversion, requested a declaration that Vollmer had not breached his fiduciary obligations to MixAir, and sought specific performance of an alleged oral agreement to assign to MixAir the

---

[4] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

patent Vollmer and Dickman jointly held. Vollmer counterclaimed for an accounting, and MixAir counterclaimed that Dickman breached the fiduciary duties he owed MixAir.

¶ 11. MixAir lost its bid to be dismissed through summary judgment, mediation failed, and the case went to a court trial lasting seven days. The trial court saw three main issues: (1) whether Dickman and Vollmer agreed to assign the patent to MixAir; (2) whether either principal breached his fiduciary duty to MixAir or to each other; and (3) whether MixAir should be dissolved and a receiver appointed. The trial court found in regard to those issues that: (1) the parties orally agreed to assign the diffuser patent to MixAir; (2) Vollmer did not breach his fiduciary duties; and (3) Dickman was not entitled to have MixAir judicially dissolved. The court ordered Dickman to execute the assignment and dismissed his complaint. Dickman appeals; MixAir and Vollmer protectively cross-appeal.

### Assignment of the Patent

¶ 12. Dickman steadfastly denies agreeing to assign the patent. He maintains that the 1997 agreement was the parties' sole agreement as to the diffuser and its patent. He asserts that because the agreement is silent as to any assignment and requires modifications to be in writing, the parties could not have agreed orally to an assignment. He contends the agreement is unambiguous and that we therefore must enforce it without searching elsewhere for evidence of the parties' intent. *See Kernz v. J. L. French Corp.*, 2003 WI App 140, ¶ 9, 266 Wis. 2d 124, 667 N.W.2d 751.

¶ 13. We concur that the agreement is unambiguous and that it does not address assigning the patent.

249

Where we part ways with Dickman is on whether the written agreement is the final answer to the assignment question. We conclude it is not, and not simply because it predates both the issuance of the patent and MixAir's incorporation. Rather, the agreement does not govern the assignment of the patent because, just as it states, the agreement "is for the purpose of marketing a diffuser." Accordingly, our task is not to interpret the agreement but to review the trial court's finding that the parties orally agreed to assign the patent.

¶ 14.   We uphold a trial court's findings of fact unless they are clearly erroneous. *Global Steel Prods. Corp. v. Ecklund Carriers, Inc.*, 2002 WI App 91, ¶ 10, 253 Wis. 2d 588, 644 N.W.2d 269. We do not reweigh the evidence or reassess the witnesses' credibility, but will search the record for evidence that supports findings the trial court made, not for findings it could have made but did not. *See Noble v. Noble*, 2005 WI App 227, ¶¶ 15–16, 287 Wis. 2d 699, 706 N.W.2d 166, *review denied*, 2006 WI 23, 289 Wis. 2d 11, 712 N.W.2d 36. Because it is for the trial court to resolve conflicts in the testimony, we will uphold its calls as to witness credibility unless they are inherently or patently incredible, and we will not second-guess the trial court's reasonable factual inferences. *See Global Steel Prods. Corp.*, 253 Wis. 2d 588, ¶ 10.

¶ 15.   Anticipating that we would apply this standard of review, Dickman also challenges the trial court's factual findings. Specifically, he contends that (1) no written documents exist which point to an agreement to assign; (2) what writings do exist suggest only a permanent license rather than a patent assignment; and (3) testimonial evidence does not establish an agreement

to assign. The clearly erroneous standard is difficult for a challenger to overcome, however, because reversal is not justified unless the evidence for a contrary finding itself constitutes the great weight and clear preponderance of the evidence. *Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 249–50, 274 N.W.2d 647 (1979).

¶ 16. Over the course of the seven-day trial, the trial court viewed dozens of exhibits and heard countless hours of testimony. Each of the trial court's findings of fact in its exhaustive written decision is meticulously cross-referenced to the record. The trial court found that Dickman and Vollmer jointly invented the diffuser, entered into the agreement to market and to direct the sharing of expenses and profits, and incorporated MixAir to assist in securing and exploiting the patent. Despite Dickman's testimony to the contrary, the court also found that around the time that MixAir was incorporated, the pair agreed to assign the patent in return for receiving equal amounts of voting shares and MixAir's agreement to fund the patent's further prosecution, which MixAir in fact did, and to pay Dickman and Vollmer each a five-percent royalty on diffuser sales. The trial court also found that Dickman signed documents indicating that MixAir owned patents and told the attorney for MixAir's insurer that the patent would, could or had been assigned, and accepted the insurer's defense to the tune of $240,000.

¶ 17. The trial court weighed Dickman's testimony that, when advantageous, he allowed others to believe that the patent either was owned by or assigned to MixAir against the fact that he later corrected the misinformation and that, under Sentry's policy, he and Vollmer were owed a defense as " 'executive officers' and directors" acting within the scope of their official duties. The court also dismissed as "disingenuous and self-

251

serving" Dickman's assertion that he should not be bound by the "boilerplate" language of the distributor agreements that MixAir owned patents. Arguments like this from a seasoned businessperson reasonably impact a court's assessment of the credibility of the testimony.

¶ 18.  Dickman stresses that no written documents support an oral agreement to assign the patent to MixAir. No Wisconsin cases have addressed this precise issue, but the parties and the court direct us to federal cases stating that the lack of a written agreement to assign a patent is of no consequence under these facts. Under federal law, the *assignment* of a patent must be in writing, 35 U.S.C § 261 (2006), but an *agreement* to assign it need not be. *See Dalzell v. Dueber Watch-Case Mfg. Co.*, 149 U.S. 315, 320 (1893). An oral agreement to assign a patent may be specifically enforced in equity upon sufficient proofs. *Id.*; *Prest-O-Lite Co. v. Avery Portable Lighting Co.*, 164 F. 60, 63 (E.D. Wis. 1908).

¶ 19.  In *Dalzell*, the question of patent ownership arose when an employee and his employer both claimed ownership rights to the employee's invention. *Dalzell*, 149 U.S. at 316–17. In the employment context, courts recognize that ownership springs from invention, and the patent laws aim to reward individuals for contributing to scientific progress. *See, e.g., Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 407 (Fed. Cir. 1996). They also recognize, however, that although the inventor presumptively owns the invention, individuals may freely consent by contract to assign all rights in inventive ideas to the employer. *Id.* Further, parties may consent via an implied-in-fact contract, a tacit agreement of the parties' understanding, inferred as a fact from their conduct in light of the surrounding circum-

252

stances. *See id.* An implied contract may be established by the parties' conduct without any words being expressed in writing or orally, if from such conduct it can fairly be inferred that the parties mutually intended to agree on all the terms. Wis JI—Civil 3024. An implied contract may rest partially on words expressed in connection with conduct or solely upon conduct. *Id.* "The essence of an implied in fact contract is that it arises from an agreement circumstantially proved." *Theuerkauf v. Sutton,* 102 Wis. 2d 176, 184, 306 N.W.2d 651 (1981).

¶ 20.   Just as with an employee/inventor, a principal shareholder and director may promise without an express agreement to assign an invention and the courts will order specific performance of the contracts. *Kennedy v. Wright,* 676 F. Supp. 888, 892 (C.D. Ill. 1988), *appeal transferred by* 851 F.2d 963 (7th Cir.), *affirmed,* 867 F.2d 616 (Fed. Cir. 1989); *see also Straubel v. Commissioner of Internal Revenue,* 29 B.T.A. 516, 521 (1933), *and Prest-O-Lite Co.,* 164 F. at 63. Such questions are decided upon all the facts of the individual case. *Kennedy,* 676 F. Supp. at 892. *Prest-O-Lite,* for example, is instructive. There, Avery, an inventor, transferred an equitable two-thirds interest in his invention to two others before he was issued a patent on it. *Prest-O-Lite Co.,* 164 F. at 63. Via an oral agreement, the three then sold full equitable title to Prest-O-Lite, accepting some of Prest-O-Lite's capital stock as full exchange for the invention and patent assignment becoming corporate assets. *Id.* Prest-O-Lite acquired equitable title through the oral transfer; Avery, holding legal title, became a trustee. *Id.* Accordingly, Prest-O-Lite's equitable title had the same legal effect as a legal title. *Id.*

¶ 21. Dickman gives a tip of the hat to *Prest-O-Lite* and *Dalzell* but argues that specific performance is improper "unless the proof is clear and satisfactory, both as to the existence of the agreement and as to its terms." *Dalzell*, 149 U.S. at 326 (citation omitted). Although there was evidence both ways—Vollmer's to show the parties agreed to an assignment, Dickman's to show they did not—in the end the proof *was* clear and satisfactory to the trial court, as its many well-documented findings establish.

¶ 22. Coming at it from another angle, Dickman insists that, rather than an agreement to assign, the evidence more strongly demonstrates a permanent license for MixAir to market and sell the diffuser and make royalty payments to him and Vollmer. He emphasizes that even patent attorney Brockman testified that he would have known if an assignment were filed but was unaware of a filing. Dickman also offers as proof Vollmer's handwritten notes memorializing a March 2003 meeting referencing royalties and stating that MixAir "is granted a permanent . . . license agreement," and argues that the notes demonstrate the absence of any agreement to assign the patent.

¶ 23. The trial court plainly considered and rejected the license possibility. It concluded that although MixAir's function and purpose could have been satisfied by license as well as by patent assignment, "it appear[ed] odd (although not impossible)" that a licensee would pay over $30,000 to advance the patent if only a license were being protected. Brockman's testimony that he would have known *if an assignment of the patent had been filed* does no more, really, than underscore the central question of this case: whether the parties orally *agreed* to assign the patent, but did not

formally assign it. Indeed, Brockman acknowledged he might not have been informed of an agreement without a filing. And as to Vollmer's notes, Dickman's own testimony neutralized their effect. He testified that when he and Vollmer met to decide how to sever his interest in MixAir, they discussed the possibility of a permanent license as "something that we would have to look at and resolve." The trial court's rejection of a license in favor of an agreement to assign finds record support and is not clearly erroneous.

### Dissolution of MixAir

¶ 24.  Dickman asked the court to judicially dissolve the corporation and appoint a receiver. A court may dissolve a corporation if a shareholder shows, among other things, that those in control are acting or will act in an illegal, oppressive or fraudulent manner, or that the corporate assets are being misapplied or wasted. WIS. STAT. § 180.1430(2)(b), (d). Dickman asserts the trial court erred as a matter of law in denying his request. He argues that he presented "volumes" of evidence of Vollmer's calculated plundering of MixAir and that such conduct need not be fraudulent or illegal but should be evaluated broadly. *See Jorgensen v. Water Works, Inc.*, 218 Wis. 2d 761, 782–83, 582 N.W.2d 98 (Ct. App. 1998).

¶ 25.  As with the assignment agreement, Dickman's challenges to these factual findings likewise miscarry. We reiterate that our review of the trial court's findings of fact is limited: we may not overturn them unless we can conclude that they are clearly erroneous. *Global Steel Prods. Corp.*, 253 Wis. 2d 588, ¶ 10. In addition, Dickman's "volumes" of evidence

must comprise the great weight and clear preponderance of the evidence. *See Cogswell*, 87 Wis. 2d at 249–50.

¶ 26. The trial court found certain bookkeeping irregularities and imperfect corporate practices, but concluded that the errors appeared unintentional and too small in magnitude to suggest purposeful siphoning off of MixAir's funds. It observed that Dickman's expert herself did not believe that Vollmer deliberately exaggerated expenses. It also noted that Dickman had available to him various remedies short of dissolution, such as seeking an accounting or pursuing a shareholder derivative suit under Wis. Stat. §§ 180.0740 – 180.0745.

¶ 27. Moreover, dissolution does not automatically result even upon proper proof. Dissolution is discretionary. *See Jorgensen*, 218 Wis. 2d at 784 n.11; *see also* Wis. Stat. § 180.1430(2) (a court may dissolve a corporation upon a shareholder's proper proof). We will uphold the trial court's exercise of discretion if it examined the relevant facts, applied a proper standard of law and, using a demonstrated rational process, arrived at a conclusion a reasonable judge could reach. *DeWitt Ross & Stevens, S.C. v. Galaxy Gaming and Racing, Ltd. P'ship*, 2004 WI 92, ¶ 54, 273 Wis. 2d 577, 682 N.W.2d 839. The trial court complied in all respects. It did not misuse its discretion in refusing to order MixAir's dissolution. We affirm.

*Remaining Issues*

¶ 28. The remaining issues actually are sub-issues of a larger one asking whether either party

breached the fiduciary duty owed to the other. The court painstakingly covered every base in its examination of Dickman's complaints about improper principal pricing and commissions, the propriety of labor reimbursement arrangements, MixAir's rent payment to the parties, duplicate and excessive expense reimbursement, manipulation of Dickman's and Vollmer's loan accounts to Dickman's and MixAir's detriment, and conversion of corporate assets. The court's careful documentation to the record and organized, thorough analysis decimate Dickman's attacks. We summarize the trial court's excellent discussion by observing that the trial court found that any discrepancies were relatively minor mistakes generated more by careless bookkeeping than by ill intent. We hold that none of the trial court's factual findings is clearly erroneous, and do not address these sub-issues further. We adopt all of the court's findings of fact and conclusions of law on them.

## CONCLUSION

¶ 29.   The essence of Dickman's arguments here is a challenge to the trial court's factual findings. He cannot retry his case on appeal. It was for the trial court to weigh the competing evidence and assess the witnesses' credibility. Other outcomes are conceivable, but that is not the test here. We therefore affirm the judgment both as to the dismissal of Dickman's claim and the order of specific performance on the patent assignment.

*By the Court.*—Judgment affirmed.