COURT OF APPEALS
DECISION
DATED AND FILED

**January 9, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1064-CR**

Cir. Ct. No. **2017CF533**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

MAURICIO AGUILA,

DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Brown County: TIMOTHY A. HINKFUSS, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Mauricio Aguila appeals from a judgment convicting him of second-degree recklessly endangering safety, which was entered

upon revocation of his deferred judgment agreement (DJA). Aguila challenges the circuit court's denial of his motion for plea withdrawal. He claims that his defense counsel provided constitutionally ineffective assistance during plea negotiations by providing him incorrect information regarding the DJA and his pleas to other misdemeanor charges and by failing to present him with discovery information that undermined the witnesses' reports. He also argues that these failures rendered his pleas not knowing, intelligent, and voluntary.

¶2 For the reasons that follow, we conclude that defense counsel did not perform deficiently and that Aguila has failed to establish a manifest injustice requiring withdrawal of his pleas. Accordingly, we affirm the judgment of conviction.

## BACKGROUND

¶3 Aguila was charged with crimes in two separate cases. First, in Brown County case No. 2017CF533, Aguila was accused of second-degree recklessly endangering safety, with use of a dangerous weapon, and disorderly conduct for pointing a gun at Lynn, a neighbor of Aguila, while Lynn was outside her home on June 12, 2016.[1] Lynn was attempting to stop a man who was confronting neighborhood residents about loud music because Lynn had been advised by police previously not to confront the neighbors. She claimed that a Hispanic male—whom she later identified as Aguila—approached her with a "gun in his right hand pointing it directly at her" with his "finger … in the trigger area."

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we use pseudonyms when referring to the victims in this case. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

2

Lynn stated that she "put her hands up in the air and exclaimed there was a gun and 'call the cops.'" Later, Lynn identified Aguila in a photo array, stating that she was "'90%' positive" the first time she reviewed the photos that Aguila was the man who had the gun, and then "100%" positive that Aguila was the man who had the gun upon a second review. Law enforcement never recovered the weapon, but officers did recover a gun case in a vehicle located at the scene.

¶4    Second, in Brown County case No. 2017CF1294, Aguila was accused of disorderly conduct for a domestic dispute involving his girlfriend, Michelle, on August 5, 2017.[2] According to the State, "there was an argument at the defendant's home that got out of hand."

¶5    These cases were resolved by a global plea agreement. The State's offer required that Aguila enter pleas to the felony second-degree recklessly endangering safety count and two counts of misdemeanor disorderly conduct in case Nos. 2017CF533 and 2017CF1294. Upon acceptance of his pleas, Aguila's conviction on the felony count would be deferred pending his successful completion of a DJA. After consulting with defense counsel, Aguila accepted the State's offer.

¶6    On March 16, 2018, at the plea and sentencing hearing, the circuit court reviewed the plea questionnaire form that Aguila completed and signed. Attached to the plea questionnaire form was a page that listed the charging details for the three charges, the factual basis for each charge, and the maximum penalties; a page detailing the terms of the State's offer; and the jury instructions

---

[2] Aguila was also charged with criminal damage to property and felony bail jumping in the second case.

3

for the offenses. After an in-depth colloquy, the court accepted Aguila's pleas and—after specifically confirming that Aguila was aware of the DJA's conditions—approved the DJA.

¶7 The circuit court then proceeded directly to sentencing. The State recommended that the court impose two years of probation on the two misdemeanor disorderly conduct counts with no additional jail time. Defense counsel concurred with the State's recommendation. Ultimately, the court accepted the parties' recommendation, withheld sentence on the disorderly conduct charges, and placed Aguila on probation for two years on each count.[3] The court concluded its sentencing by commenting to Aguila that defense counsel "did a very good job here. In fact, you don't have a felony if you do what you're supposed to do in the next two years. That's worth a lot. And stay away from these people, do you understand that?" Aguila replied, "I do, Your Honor."

¶8 In 2019, the State filed new charges against Aguila after police were dispatched for another domestic dispute between Aguila and Michelle. Allegedly, a verbal altercation between Michelle and Aguila escalated when Aguila "grabbed [Michelle] by the neck" and "she was losing her breath and was unable to talk, because he squeezed so hard on her neck." The State charged Aguila in Brown County case No. 2019CF905 with strangulation and suffocation, battery,

---

[3] Regrettably, the State filed an incorrect amended Information, which changed the charges of second-degree recklessly endangering safety and disorderly conduct in case No. 2017CF533 to two counts of intentionally pointing a firearm at a person. At a later hearing, the State explained that the amended Information was filed as part of a separate plea agreement before defense counsel "convinced the [S]tate to switch that to a [DJA] on the original charge…. Unfortunately, that amended [Information] didn't get withdrawn." As a result of that incorrect Information, the circuit court then entered an incorrect judgment of conviction, placing Aguila on probation for two years for intentionally pointing a firearm at a person, instead of for disorderly conduct.

disorderly conduct, and bail jumping. This case was tried to a jury, and Aguila was acquitted on all charges.

¶9 As a result of the new charges, however, the State moved to revoke Aguila's probation and DJA. According to the State, Aguila's probation was revoked for violating his no-contact order with Michelle and for causing Michelle harm. Aguila did not contest his revocation, a decision he made prior to consulting with his attorney and by relying on the advice of his probation officer. At the sentencing after revocation, Aguila stated, "I know I did violate my no[-]contact [order] and that I am guilty of [that allegation] and for that I'll take my punishment."

¶10 Due to the State's error that resulted in an incorrect judgment of conviction, *see supra* note 3, the circuit court sentenced Aguila to six months in jail for intentionally pointing a firearm at a person, rather than for disorderly conduct. That six-month jail sentence exceeded the statutory maximum for a disorderly conduct charge by three months. *See* WIS. STAT. §§ 947.01(1), 939.51(3)(b). The court also sentenced Aguila to ninety days in jail, to be served concurrently, on the disorderly conduct count in case No. 2017CF1294.

¶11 In a separate proceeding, the State moved to revoke the DJA on the ground that Aguila failed to comply with the agreement's conditions. Those conditions included successfully completing probation on the disorderly conduct convictions and "commit[ting] no further acts which rise to the level of probable cause of a violation of the criminal laws of the State of Wisconsin." On July 28, 2020, the circuit court granted the State's motion and revoked the DJA, ordered a presentence investigation report, and set a date for sentencing.

¶12    Shortly thereafter, Aguila retained new counsel (hereinafter, postconviction counsel) and moved to vacate the DJA and for plea withdrawal.  In Aguila's motion, he alleged that: (1) defense counsel provided constitutionally ineffective assistance; (2) "he was not fully aware of the extent of **Brady**[4] evidence related to a key witness and investigating officer, former-Lieutenant Robert Korth, at the time he entered his plea[s] and accepted the [DJA]";[5] and (3) "he did not fully understand the evidence against him and that there were problems with the case that would make it difficult for the State to prove the case against him at trial," listing nine facts about the case of which he was "unaware." Aguila claimed that he had wanted to go to trial because he was innocent of the charges.

¶13    According to Aguila, defense counsel was deficient because he "provided him inaccurate information about the [DJA] and [the] consequences of its acceptance and his plea[s]," including that by entering his pleas he was "not going to be found guilty of a felony" and that "his probation could be terminated at 12 months with good behavior."  He also claimed that he was "never advised by counsel that waiving his [probation] revocation hearing rather than fighting the

---

[4] **Brady v. Maryland**, 373 U.S. 83 (1963).

[5] Aguila also filed a motion to compel production of **Brady** evidence.  Citing a news report, Aguila explained that "[s]ubsequent investigation has revealed that throughout the time of [the plea] negotiations and ahead of the plea in Mr. Aguila's case, … Korth was under investigation for participating in racist, sexist, and illegal harassment of minority coworkers at the Green Bay Police Department."  Korth was one of the officers on the scene at the time of Aguila's arrest.  Aguila alleged that had he known this information about Korth prior to entering his pleas, it "would have been valuable **Brady** evidence."

This issue was discussed at the evidentiary hearing, and the circuit court later denied the motion, stating that the allegations against Korth "had to do with things other than telling the truth," he was not on the State's witness list, and he was not a material witness.  Aguila does not renew this **Brady** claim on appeal.

matter would give the State the ability to revoke his" DJA. Finally, he asserted that "there were ***Bangert***[6] deficiencies during the plea hearing" that "[f]urther impact[ed]" his "understanding of the agreement," and "he did not receive all the necessary admonishments."

¶14 The circuit court held an evidentiary ***Machner***[7] hearing over two days, at which Aguila and defense counsel testified. The court then issued a written order denying Aguila's plea withdrawal motion, concluding that Aguila had not demonstrated that defense counsel's performance was deficient or that his pleas were not knowingly, voluntarily, and intelligently entered. The court specifically found that Aguila's testimony was not credible concerning his alleged discussions with defense counsel.

¶15 The circuit court ultimately sentenced Aguila to time served for the second-degree recklessly endangering safety count. At sentencing, the court stated that it was "cognizant of the sentence in that he was given six months on a probation revocation [on the intentionally pointing a firearm count]. That was beyond the maximum time that he was supposed to receive" had the judgment of conviction been correctly entered. The court observed that Aguila "needs credit for the time he sat and I'm giving it to him because he shouldn't have sat that time in jail, that's the bottom line." Aguila appeals.

---

[6] ***State v. Bangert***, 131 Wis. 2d 246, 389 N.W.2d 12 (1986).

[7] ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

**DISCUSSION**

¶16    After sentencing, "a plea will not be disturbed unless the defendant establishes by clear and convincing evidence that failure to withdraw the guilty or no contest plea will result in a manifest injustice." *State v. Taylor*, 2013 WI 34, ¶48, 347 Wis. 2d 30, 829 N.W.2d 482. Here, Aguila was subject to a DJA, and the manifest injustice standard applies to Aguila's motion to withdraw his plea after the DJA was ordered. *See State v. Daley*, 2006 WI App 81, ¶¶16, 18, 292 Wis. 2d 517, 716 N.W.2d 146.

¶17    A defendant can demonstrate a manifest injustice by showing that he or she did not knowingly, intelligently, and voluntarily enter his or her plea. *State v. Brown*, 2006 WI 100, ¶18, 293 Wis. 2d 594, 716 N.W.2d 906. "A plea that was 'not entered knowingly, voluntarily, and intelligently violates fundamental due process, and a defendant therefore may withdraw the plea as a matter of right.'" *State v. Dillard*, 2014 WI 123, ¶37, 358 Wis. 2d 543, 859 N.W.2d 44 (citation omitted). A defendant is entitled to withdraw his or her plea where he or she received misinformation if the defendant presents a "persuasive account" of why, absent the misinformation, he or she would not have entered a plea and would have instead gone to trial. *Id.*, ¶52.

¶18    Another "way to demonstrate manifest injustice is to establish that the defendant received ineffective assistance of counsel." *Id.*, ¶84. To establish ineffective assistance of counsel, the defendant must prove both that counsel's performance was deficient—in other words, outside the wide range of professionally competent assistance—and that counsel's errors were prejudicial. *Id.*, ¶¶85, 88. "Normally, judicial scrutiny of an attorney's performance will be highly deferential." *Id.*, ¶88 (citation omitted). "To prove prejudice, a defendant

'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.*, ¶95 (citation omitted). In the plea withdrawal context, prejudice requires that the defendant establish that he or she would not have pled guilty and would have instead insisted on going to trial. *Id.*, ¶¶95-96. We need not address both prongs of the ineffective assistance analysis if the defendant fails to make a sufficient showing on either one. *Strickland v. Washington*, 466 U.S. 668, 697 (1984).

¶19     Both ineffective assistance of counsel claims and claims that a plea was not knowing, intelligent, and voluntary are reviewed under a mixed standard of review. *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93 (ineffective assistance); *Brown*, 293 Wis. 2d 594, ¶19 (knowing, intelligent, and voluntary plea). The circuit court's factual findings are upheld unless clearly erroneous. *State v. Mayo*, 2007 WI 78, ¶32, 301 Wis. 2d 642, 734 N.W.2d 115; *Brown*, 293 Wis. 2d 594, ¶19. The clearly erroneous standard applies to a court's findings regarding witness credibility, and we will search the record for evidence to support the court's findings. *Dickman v. Vollmer*, 2007 WI App 141, ¶14, 303 Wis. 2d 241, 736 N.W.2d 202. Whether the facts meet the legal standards for ineffective assistance or for establishing that a plea was not knowing, intelligent, and voluntary are questions of law that we review independently. *Mayo*, 301 Wis. 2d 642, ¶32; *Brown*, 293 Wis. 2d 594, ¶19.

¶20 On appeal, Aguila advances essentially the same arguments for plea withdrawal that he presented to the circuit court.[8] Aguila asserts that his defense counsel was constitutionally ineffective "for providing him fundamentally incorrect legal advice regarding the details and demands of the [DJA and] for failing to present him with favorable evidence undermining the veracity of the reporting and witness testimony against him when he was … deciding whether to accept the plea." Further, he claims that had he been provided the proper information, he would not have accepted the DJA or entered his pleas. Thus, Aguila argues for plea withdrawal on the basis of ineffective assistance of counsel and on the basis that his pleas were not knowingly, voluntarily, and intelligently entered.

¶21 The State, in contrast, argues that "[t]he sole issue presented in this appeal is whether the circuit court made clearly erroneous credibility determinations and factual findings when it held that Aguila was not entitled to withdraw his plea[s]" and that "the credibility determinations and factual findings on which the circuit court relied to deny his motion are supported by the record." (Formatting altered.) We agree with the State that the court's findings are not clearly erroneous and that, given our standard of review, we must affirm.

---

[8] As noted, Aguila does not renew his *Brady* claim, but he does maintain that because he was unaware of the information pertaining to Korth prior to his pleas, his pleas were not knowingly, intelligently, and voluntarily entered. Aguila also does not continue to advance an argument regarding his decision to waive his probation revocation hearing. Finally, he does not argue before this court that there were any *Bangert* deficiencies during the plea hearing. As the State explained, Aguila's claims on appeal are all *Nelson*/*Bentley* claims based on defense counsel's alleged failures. *See Nelson v. State*, 54 Wis. 2d 489, 195 N.W.2d 629 (1972); *State v. Bentley*, 201 Wis. 2d 303, 548 N.W.2d 50 (1996); *see also State v. Howell*, 2007 WI 75, ¶74, 301 Wis. 2d 350, 734 N.W.2d 48 (explaining the different purposes of *Nelson*/*Bentley* and *Bangert* motions).

¶22    First, Aguila claims that defense counsel "provided fundamentally incorrect legal advice" to Aguila regarding the DJA and the plea bargain. Specifically, Aguila asserts—and he also testified to the same—that he was told the following incorrect information: (1) "the agreement would not result in [him] being found 'guilty' of a felony offense, though entry of a 'guilty' plea to the felony was a mandatory part of the offense"; (2) "the State would be dismissing all charges related to Brown County Case [No.] 2017CF1294 when in fact the plea negotiation required that he enter a plea to a disorderly conduct charge specifically associated with that case"; (3) "his probation could be terminated after service of 12 months with good behavior when in fact this was not possible as part of the [DJA]"; and (4) "the agreement could not be revoked simply because someone accused him of a crime for which he was innocent (a genuine concern given his position in the instant case) and that the State would have to prove the allegations against him before the judge would set aside the agreement."

¶23    As to Aguila's first and second points, Aguila identifies an email — also presented to the circuit court—between defense counsel and Aguila.  In Aguila's email, on the eve of the plea hearing, he stated, "I have reviewed the [DJA] and I don't really think that this offer is any good given that I will be pleading guilty to the felony charges and waiving my court right if I get accused of another crime like … what landed me in this situation."  Defense counsel responded:

> We can discuss at court.  Please meet me at 10 on the 3rd floor.
>
> It's important to note that all charges pertaining to [Michelle]'s case will be dismissed for good.  The felony charge you'll plea to is on the weapon case, but the judge will not find you guilty.
>
> I can explain your other options as well.  See you at 10.

11

According to Aguila, defense counsel's response

> contains plainly incorrect information that the agreement does not include a plea to charges related to the other pending case, it also provides misleading information when it states that the judge will not find Mr. Aguila guilty, as the court did just that, only to later vacate the judgment if he completed the agreement.

¶24 At the **Machner** hearing, defense counsel testified that the email exchange was "not the entirety of our discussion in this case" and that he "told [Aguila] before court" that the circuit court "wouldn't be entering a judgment of conviction." According to defense counsel, he clarified to Aguila that "if he succeeded in the deferred [agreement] it would be *as if* he [were] never found guilty. In other words, there would never be a judgment of conviction entered. So practically speaking, it was as if he had never been found guilty of this charge." (Emphasis added.) As to the case involving Michelle—case No. 2017CF1294—defense counsel admitted that his comment in the email "seems to be an error," but he explained that the "deferred agreement would have spelled out exactly what was happening with the other case"—which it certainly did—and that Aguila "asked a lot of questions and I think we probably had a long discussion before court." Further, a page attached to the plea questionnaire, which Aguila signed and which stated that "everything was explained to me by my attorney," listed a condition of no contact with Michelle and the related case number, which was then the same case number listed for one of the disorderly conduct counts to which he was entering a plea.

¶25 Based on defense counsel's testimony, the circuit court found that "Aguila may have had reservations about pleading but any reservations were answered in the conference that [defense counsel] and [Aguila] had immediately prior to the plea hearing." The court accepted defense counsel's credible

12

testimony regarding the discussion that took place after the email communication. In response, Aguila claims that there were "no notes or other documentation substantiating [defense counsel's] claims," but sworn testimony from a witness is, in itself, sufficient factual evidence. While Aguila claims that the court erred in relying on defense counsel's testimony because "[defense] counsel had little recall of the case," defense counsel actually testified that he "remember[ed] this case very well." Thus, the court's findings are supported by sufficient evidence in the record, and Aguila has asserted no basis for us to conclude that the court's findings were clearly erroneous on these issues.

¶26 On the third issue, Aguila identifies another email—also presented to the circuit court—where Aguila inquired about early release from probation. Aguila wrote: "I have a question about a case. I have completed more than half my probation period. I remember talking with you about qualifying for an early release once I reached half of my probation. Can you help me with this?" According to Aguila, he "had never been charged with a crime prior to this incident and never been placed on probation. Thus, [his] testimony and assertions that this information came from [defense] counsel during the plea negotiations and discussions of the [DJA] were plainly credible."

¶27 The circuit court specifically found that Aguila was "not credible" as to his claim that defense counsel told him he could obtain "early release" from probation, finding that "the discussion did not take place." In particular, the court credited defense counsel's testimony that he had no memory of an early release discussion with either Aguila or the State. Defense counsel explained, "I would never push a prosecutor, if I got a [DJA], to then work in something where the client could possibly ask for early release of probation." Again, aside from Aguila's self-serving testimony and conclusory statement that he could have

obtained knowledge about early release *only* from defense counsel—and not, for example, from an internet search or another individual—he has presented no persuasive evidence upon which we may conclude that the court clearly erred.

¶28 Finally, as to the fourth issue—that the DJA could not be revoked simply because someone accused him of a crime—Aguila testified that defense counsel told him that he "had to be convicted of something, not just accused of a crime." Aguila claimed that had he received the correct information from defense counsel about the plea negotiations and the DJA, he would not have entered into the DJA.

¶29 The circuit court did not credit Aguila's testimony on this point. It also does not appear that postconviction counsel asked defense counsel at the ***Machner*** hearing whether he actually made this statement to Aguila. Aguila does not reference defense counsel's testimony on this point, and we could not find any such testimony upon our review. Instead, the court noted the exchange between itself and Aguila at the plea hearing, where the court specifically asked Aguila if he agreed with the DJA, if he signed the DJA, and if he had gone through the DJA with defense counsel. Aguila answered affirmatively. Further, the court specifically brought Aguila's attention to "conditions, [6.a., b. and c.]" in the DJA, asking if he was "aware" of those conditions. Aguila again agreed. Condition 6.a. specifically stated that Aguila agreed to "[c]ommit no further acts *which rise to the level of probable cause* of a violation of the criminal laws or ordinances of the State of Wisconsin, counties within the State of Wisconsin, or of any other state, or of the United States of America." (Emphasis added.) Thus, it was clearly stated in the DJA that Aguila did not need to be *convicted* of a new crime for him to violate the terms of the DJA, and Aguila told the court that he had read and understood those terms. Further, as noted above, Aguila acknowledged that he

14

understood that he need only be "accused of another crime" in his email to defense counsel prior to his plea.

¶30    As the State argues, the majority of the information that Aguila claims he was misinformed about was addressed at other points in the plea process.  For example, the circuit court's written decision denying Aguila's plea withdrawal motion cited the transcript of the "very detailed plea colloquy," the transcript of the arraignment, the criminal complaint, the DJA, and the plea questionnaire and attached documents.  In concluding that Aguila was not credible in his assertions that defense counsel performed deficiently by providing incorrect information, the court relied on these documents, Aguila's statements during the plea hearing that he had reviewed these documents with defense counsel, Aguila's testimony at the *Machner* hearing that he did in fact read the documents prior to entering his pleas, and defense counsel's testimony that he provided Aguila the correct information.

¶31    At the *Machner* hearing, Aguila claimed that despite his answers to the circuit court's questions at the plea hearing, he did not "know what the criminal system was all about" so he "was under the impression that [his] attorney had everything figured out."  However, his claims that he merely "trusted [his] attorney" are belied by defense counsel's comments at the plea hearing that Aguila was "very inquisitive about all the conditions of probation as well as the deferred agreement and he read it several times."  Additionally, in its decision, the court specifically observed that Aguila "has a high school education and a degree from Northeastern Wisconsin Technical College and has worked as an engineer at a local company.  He clearly is educated and has an attention to detail as engineers must."  The court found those facts "significant" to the matter at hand.

¶32    Therefore, we conclude that Aguila failed to establish that defense counsel's alleged errors actually occurred, and, thus, he failed to prove that defense counsel performed deficiently. Further, to the extent that these alleged errors or misunderstandings on Aguila's part could have rendered his pleas not knowing, intelligent, and voluntary, based on the record in this case, the circuit court was not persuaded by Aguila's account, and neither are we. Aguila has provided no evidence that would call into question the court's credibility determinations or factual findings, which are supported by evidence in the record and are not otherwise "inherently or patently incredible." *See **Dickman***, 303 Wis. 2d 241, ¶14.

¶33    Next, Aguila argues that defense counsel's failure to present him with discovery documents as well as "the numerous problems with the evidence in the case deprived him of a knowing and voluntary choice to enter into the plea agreement." He claims that had he "known about this favorable evidence, he would have forgone the plea agreement and went to trial instead."

¶34    In particular, Aguila asserts that he was unaware of numerous factual discrepancies related to the witnesses' statements, including discrepancies regarding the suspect's description and the gun's description. At the ***Machner*** hearing, Aguila testified that defense counsel had not discussed these factual issues with him prior to entry of his pleas. As to the witnesses' statements, the circuit court's written decision adopted the State's argument, concluding that "much of what [Aguila] complains about is in the complaint…. Again, something that he [is] said to have read."

¶35    We agree with the circuit court that Aguila's alleged factual discrepancies were evident from the complaint. For example, Aguila claims he

"was not aware that [the witnesses'] identifications of Mr. Aguila occurred three days after the incident and after he asserted that there had been no altercation with his family and that the women were shouting racial epithets at his family on the night in question." The complaint is clear, however, that the incident occurred on June 12, 2016, and the witnesses provided written statements on June 15 and the photo lineup occurred on June 16—which are three and four days later, respectively. Aguila also claims that he did not know that two other witnesses did not see a gun being pointed at Lynn. Aguila does not identify these two witnesses in either his brief or his postconviction motion, but from the complaint, the witnesses appear to be Lynn's wife and Lynn's son. Again, the complaint states that Lynn's wife saw a "shorter Latino male … holding a silver revolver … and stated he had it down at his right side holding it with his right hand." The complaint continues: "At no point in time did [Lynn's wife] see the gun pointed at anyone, but she did hear [Lynn] question the male about why he needed a weapon." As for the second witness, if Aguila is referring to Lynn's son, according to the complaint, he never came into the alley and therefore would not have seen a gun.

¶36 Further, Aguila claims that he was not aware "that the two primary witnesses reported seeing a different number of men in the alley during the confrontation, nor was he aware that both women told police that prior to their arrival, they saw a Jeep Liberty carrying four Hispanic men fleeing the scene." Here, too, the complaint is clear that Lynn reported that she encountered two men, while her wife reported that there were three men, and both women noted "a blue Jeep Liberty."

¶37 Finally, Aguila has identified discrepancies with the gun—which was never found—suggesting that the gun that fit into the gun case that law

enforcement recovered "would have been impossible to conceal in a back jeans pocket as described by the witnesses" because "the gun that fit into that case … weighed nearly three pounds and was nearly a foot long." However, the witnesses reported that the gun had "a long barrel" and that when the suspect "put the gun into his right back pocket … it was weighing down his pants slightly."

¶38 In reply, Aguila counters that "there were issues with the identification that do not appear in the criminal complaint, specifically misidentifying his height, age, length of hair and facial hair." We disagree with Aguila that the differences regarding the suspect's identification were not contained within the complaint. According to the complaint, the initial witness report identified the suspect "as approximately 5'5" to 5'7" tall, around 180 [pounds], with a shaved head, sunglasses, a white button up shirt, and jeans." The complaint then states that later, written reports described that suspect as "5'8", approximately 180 [pounds] with dark short buzzed hair, approximately 40 to 42 years old wearing aviator sunglasses, a white button down and stone wash[ed] jeans" and as "5'6", 5'8", approximately 180 [pounds] with short hair and clean." The differences Aguila now highlights—namely, that he was thirty years old at the time of his arrest; that he is five feet, four inches tall; and that "he had a shaved head and goatee as documented in his booking photo"—would have been evident to him on his review of the complaint.

¶39 Aguila also claims that the information regarding Korth was not made known to him prior to accepting the State's offer. Defense counsel specifically testified that he "had no idea what was going on with … Korth at that time." Defense counsel explained that he was concerned with what the victim would have testified to, not Korth, and had he known about Korth's disciplinary proceedings, he did not "know [if he] would have made a different

recommendation" to Aguila. He also noted that the issue with Korth had come up in another case, "[a]nd the advice to that client was the same."

¶40 On appeal, Aguila makes much out of Korth's involvement in this case. The State, however, did not list Korth as a witness and did not intend to call Korth at trial. Further, the complaint mentions only that Korth was at the scene and that "Korth called out that in front of [a home] there was loud music and there were 2 male Hispanics in the driveway; one with a white shirt and jeans, and one with a gray hoodie and khaki shorts." Aguila cites additional information contained in a computer aided dispatch report that Korth allegedly saw Aguila with a weapon, but that information was not included in the complaint. Korth's police report, created after the incident, states that he encountered Aguila from a distance, but he "was too far to see if he had empty hands or not. Based on my training and experience, [Aguila's] body language was consistent with someone pointing a handgun at me."

¶41 When this information was brought to the circuit court's attention, it agreed with the State that "Korth said he didn't know whether [Aguila] had empty hands or not" and that he did not "actually [see] a firearm pointed at him," calling Aguila's position an "overreach." Accordingly, the court specifically found that Korth was not a material witness and that he "offer[ed] nothing to the defense to be called as a witness." Aside from disagreeing with the court's determination that information regarding Korth was not relevant, Aguila does not offer anything

other than his contrary opinion to explain why the court's finding was clearly erroneous.[9]

¶42    In its written decision denying Aguila's motion, the circuit court specifically stated: "I am finding that the reason [Aguila] is complaining about the [DJA] is that he did not successfully complete the deferred agreement and now has a felony conviction." At sentencing, the court reiterated that it did not "believe" Aguila's purported reasons for seeking plea withdrawal, stated that Aguila "knew exactly what [he was] doing," and observed that "it's disingenuous to say that he didn't understand what was going on. I think [he] more than understood." Aguila has not shown on appeal that the court's findings are clearly erroneous. Based on the court's factual findings, we cannot conclude that the court erred in determining that defense counsel did not provide constitutionally ineffective assistance and that Aguila's pleas were knowing, intelligent, and voluntary.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[9] According to Aguila, his defense attorney's testimony that "he does not focus on what the officers say in their reports, only what 'the victim's going to say,'" certainly cannot be considered good strategic advice in almost any case, and particularly this one where Mr. Aguila was arrested on scene only because of the statements of Mr. Korth." Aguila cites to Record 85 for that proposition, but Record 85 does not appear to be included in the appellate record. Our independent investigation revealed that Record 85 of the circuit court record was a hearing notice. As the appellate record stands, the complaint does not suggest that Aguila was arrested "only because of the statements" of Korth. Aguila was arrested because he fit the initial description of the suspect and did not immediately comply with law enforcement instructions.