COURT OF APPEALS
DECISION
DATED AND FILED

February 22, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1958**

STATE OF WISCONSIN

Cir. Ct. No. 2022CV43

IN COURT OF APPEALS
DISTRICT IV

KARIN EICHHOFF, STEVEN SPEER AND RODERICK RUNYAN,

  PLAINTIFFS-APPELLANTS,

 V.

NEW GLARUS BREWING COMPANY AND DEBORAH A. CAREY,

  DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Green County: FAUN MARIE PHILLIPSON, Judge. *Affirmed*.

Before Kloppenburg, P.J., Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Karin Eichhoff, Steven Speer, and Roderick Runyan (collectively, "the plaintiff shareholders") sued Deborah Carey and New Glarus Brewing Company ("the Brewery") alleging claims of minority shareholder oppression and securities fraud. The circuit court dismissed the plaintiff shareholders' complaint for failure to state a claim for which relief may be granted. The plaintiff shareholders appeal, arguing that the complaint states claims for both minority shareholder oppression and securities fraud. We reject their arguments and, therefore, affirm.

## BACKGROUND

¶2     When considering a motion to dismiss, all well-pleaded facts in a complaint must be accepted as true. *Cattau v. National Ins. Servs. of Wis.*, 2019 WI 46, ¶4, 386 Wis. 2d 515, 926 N.W.2d 756. The facts stated here and throughout this opinion are taken from the allegations and uncontested documents referenced in the operative complaint and attached either to the complaint or the Brewery's motion to dismiss.[1] We relate here background facts sufficient to

---

[1] *See* *Soderlund v. Zibolski*, 2016 WI App 6, ¶37, 366 Wis. 2d 579, 874 N.W.2d 561 (adopting the incorporation-by-reference doctrine, which permits a court to consider a document attached to a motion to dismiss without converting the motion to one for summary judgment, so long as the document is referred to in the plaintiff's complaint, it is central to the plaintiff's claim, and its authenticity has not been disputed). The purpose of the doctrine is to "prevent[] a plaintiff from evad[ing] dismissal … simply by failing to attach to [the] complaint a document that prove[s] [plaintiff's] claim has no merit." *Id.*, ¶38 (citation omitted). Any document so attached prevails over inconsistent allegations in the complaint. *Peterson v. Volkswagen of Am., Inc.*, 2005 WI 61, ¶15, 281 Wis. 2d 39, 697 N.W.2d 61 (citing *Friends of Kenwood v. Green*, 2000 WI App 217, ¶11, 239 Wis. 2d 78, 619 N.W.2d 271).

The plaintiff shareholders do not dispute that the documents attached to their complaint (the Shareholders Agreement, lease agreements, correspondence, the Private Placement Memorandum, and the Amended and Restated Shareholders Agreement) and certain documents attached to the Brewery's motion to dismiss (the Brewery Bylaws, correspondence from the Wisconsin Department of Revenue denying the Brewery's application for a liquor or wine manufacturing permit, and the 2019 stock purchase agreements signed by the plaintiff shareholders) are properly part of our review in deciding whether the complaint states a claim.

(continued)

2

provide context for this appeal and relate additional facts as pertinent to the specific issues in the discussion that follows.

¶3    The plaintiff shareholders and Carey are four of approximately 25 shareholders of the Brewery, a closely held Wisconsin corporation that is organized as a Subchapter "S" corporation and which operates a microbrewery that brews and distributes "premium beer."[2]  The Brewery was incorporated in 1993 at which time 40,000 shares, at $10 per share, were issued to the plaintiff shareholders and others.  Eichhoff's late husband purchased 625 voting shares and 625 non-voting shares, for an initial investment of $12,500, and purchased additional shares over time.[3]  Speer purchased 1,250 voting shares and 1,250 non-voting shares, for an initial investment of $25,000.  The record does not disclose how many voting and non-voting shares Runyan purchased in 1993.  When they purchased their shares in 1993, each of the plaintiff shareholders entered into a Shareholders Agreement.

¶4    In 1993, the Brewery also issued 25,000 voting shares to "its founder" Carey, who provided capitalization of the Brewery in the amount of

We do not consider the email correspondence from July 2018 between Speer and the Brewery's then-General Counsel attached to the Brewery's motion to dismiss, because, as the plaintiff shareholders note, that correspondence is not referenced in the complaint and, therefore, does not meet the *Soderlund* criteria.

The operative complaint for the purposes of this appeal is the First Amended Complaint. For ease of reference, we refer to the First Amended Complaint simply as "the complaint."

[2] An "S" corporation is not taxed but passes its income, gain, or loss through to its shareholders, who report their pro rata shares of that income, gain, or loss on their individual tax returns. *Jorgensen v. Water Works, Inc.*, 2001 WI App 135, ¶11, 246 Wis. 2d 614, 630 N.W.2d 230.

[3] Eichhoff has held the shares since her husband's death in 2015.

$40,000, personally guaranteed a loan to purchase equipment for the Brewery, and rendered certain services for the Brewery. Since 1993, Carey has been the president and CEO, the sole director, and the controlling shareholder of the Brewery (meaning that she has since 1993 owned the majority of the Brewery's voting shares). Since 1993, Carey has also managed the business of the Brewery and, with the brewmaster (her husband Dan Carey), operated the Brewery. None of the plaintiff shareholders are or have been paid employees of the Brewery.

¶5     In 2015, Carey "set up" the Brewery Employee Stock Ownership Plan, which has since acquired shares for the benefit of Brewery employees. From about 2016 onward, Carey has used Brewery assets and staff to construct and operate on Brewery property the Sugar River Distillery, which is owned by Carey and her family.

¶6     In 2019, the plaintiff shareholders sold some of their shares for $2,071 per share as follows: Eichhoff sold 1,250 voting shares to the Brewery for a total of $2,588,750; Speer sold 625 voting shares to the Brewery for a total of $1,294,375; Runyan sold 40 voting shares to the Brewery Employee Stock Ownership Plan for a total of $82,840.

¶7     In 2020, Carey voted to change the preamble to the Brewery's bylaws to read, as alleged in the complaint, "that the Brewery intends to remain independent and locally owned and that it would be operated (in part) for the benefit of the community."

¶8     In 2021, Carey used Brewery staff and resources to form a nonprofit foundation called "Only in Wisconsin Giving, Inc.," to be the Brewery's marketing arm.

¶9    Currently, Carey owns 50.48% (18,500 shares) of the voting shares; the Brewery Employee Stock Ownership Plan owns 26.6% (9,743 shares) of the voting shares; a trust for one of Carey's daughters owns 4.09% (1,500 shares) of the voting shares; Eichhoff owns 3.41% (1,250 shares) of the voting shares; Speer owns 1.71% (625 shares) of the voting shares; Runyan owns .46% (170 shares) of the voting shares; and other investors who are not parties to this action own the remaining 13.25% of the voting shares.

¶10    Carey and the Brewery historically "reinvested profits into the business, grew the business, practiced sound corporate governance, and increased shareholder value." The Brewery has consistently generated large profits, has paid off all Brewery debts, has recently generated net income of between $15 million and $20 million per year, and currently has approximately $40 million in cash and cash equivalents.

¶11    In March 2022, the plaintiff shareholders commenced this action, alleging minority shareholder oppression under WIS. STAT. § 180.1430(2) (2021-22) and securities fraud claims under WIS. STAT. § 551.501(2) against Carey and the Brewery.[4]  The plaintiff shareholders seek an order requiring that:  Carey and the Brewery purchase the plaintiff shareholders' shares at "fair value"; independent directors be appointed for the Brewery; all non-voting shares be

---

[4] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

reclassified as voting shares; and Carey and the Brewery pay damages and attorney fees.[5]

¶12    The gravamen of the plaintiff shareholders' complaint is that Carey and the Brewery have:  (1) recently and increasingly focused on operating the Brewery to benefit the nonprofit foundation and the local community and on taking steps to keep the Brewery "locally owned"; and (2) misrepresented or not disclosed information potentially pertinent to the value of the plaintiff shareholders' shares, so as to deny the plaintiff shareholders the "reasonable opportunity" to obtain "fair value" for their shares from an outside sale.

¶13    Carey and the Brewery each filed a motion to dismiss for failure to state a claim for which relief may be granted, and the circuit court granted both motions.  The plaintiff shareholders appeal.

## DISCUSSION

¶14    As a preliminary matter, we first address an argument made by the plaintiff shareholders in their reply brief, which is directed at the separate briefs that Carey and the Brewery each filed as respondents on appeal.  Specifically, the plaintiff shareholders argue that we should deem Carey and the Brewery to have made certain concessions by arguing distinct issues in each respondent's brief that

---

[5] "Fair value" refers to the value of stock not as a commodity in the open market, but as a proportionate share of the enterprise as a whole.  In contrast, "fair market value" is the amount for which the stock would sell in the open market, and, in the case of closely held corporations, usually includes a minority discount for non-controlling shares.  ***HMO-W Inc. v. SSM Health Care Sys.***, 2000 WI 46, ¶24 n.5, ¶31, 234 Wis. 2d 707, 611 N.W.2d 250; ***Northern Air Servs., Inc. v. Link***, 2011 WI 75, ¶13 n.6, 336 Wis. 2d 1, 804 N.W.2d 458 ("'Fair market value' refers to a share's value after downward adjustments are made to its 'fair value' to account for lack of control (in the case of shares representing a minority interest) and lack of ready marketability.").

are not argued in the other respondent's brief, while also joining or adopting in full the arguments that are made in the other respondent's brief. [6]

¶15 In their reply brief, the plaintiff shareholders argue that, by filing a separate brief and joining the other's brief, Carey and the Brewery have each violated WIS. STAT. RULE 809.19(5)(b), which provides, "In appeals involving more than one respondent … each respondent may file a separate brief or a joint brief with another respondent." The plaintiff shareholders argue that Carey and the Brewery have, by incorporating each other's brief, violated this rule and improperly exceeded the word limits in RULE 809.19(8)(c). Thus, the argument continues, we should deem Carey to have conceded (by not arguing) the issues argued by the Brewery, and the Brewery to have conceded (by not arguing) the issues argued by Carey.

¶16 We decline to do so here. We acknowledge that Carey and the Brewery's dividing up the issues may present a challenge to fully addressing all issues in the reply brief while staying within the word limit. However, the plaintiff shareholders could have moved but did not move for an enlargement of that limit. In addition, as we explain below, we agree with the arguments made by the Brewery in its brief—that the allegations in the complaint do not establish minority shareholder oppression or securities fraud by either Carey or the Brewery, and we conclude that it would be inappropriate to deem that Carey has conceded to the contrary.

---

[6] Simply summarized, Carey argues that the complaint must be dismissed because the plaintiff shareholders cannot obtain relief other than dissolution as a remedy for oppression, and the Brewery argues that the complaint must be dismissed because it does not allege facts that amount to oppression or securities fraud.

¶17 We now turn to the merits of the appeal of the circuit court's order granting Carey's and the Brewery's motions to dismiss the plaintiff shareholders' complaint. The standard of review of a motion to dismiss is well established:

> A motion to dismiss tests the legal sufficiency of the complaint. Upon a motion to dismiss, we accept as true all facts well-pleaded in the complaint and the reasonable inferences therefrom. However, a court cannot add facts in the process of construing a complaint. Moreover, legal conclusions asserted in a complaint are not accepted, and legal conclusions are insufficient to withstand a motion to dismiss. Therefore, our focus is on factual allegations made in the complaint. We determine whether the facts alleged state a claim for relief, which is a legal question that we review independently.

*Townsend v. ChartSwap*, 2021 WI 86, ¶10, 399 Wis. 2d 599, 967 N.W.2d 21 (citations omitted).

¶18 Under WIS. STAT. § 180.1430(2)(b), a court may dissolve a corporation if "the directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent." Sec. 180.1430(2)(b). Under WIS. STAT. §§ 551.501 and 551.509, a person may not "in connection with the … purchase of a security," "make an untrue statement of a material fact[,] or [] omit to state a material fact." Sec. 551.501(2). We address in turn whether the complaint's allegations state claims of shareholder oppression or securities fraud.

## I. Minority Shareholder Oppression

¶19 An allegation of oppression is "a legal standard to be fulfilled before a circuit court may [grant relief] based on the acts of those who control [a corporation]." *Reget v. Paige*, 2001 WI App 73, ¶23, 242 Wis. 2d 278, 626 N.W.2d 302; *Northern Air Servs., Inc. v. Link*, 2011 WI 75, ¶75 n.32, 336

8

Wis. 2d 1, 804 N.W.2d 458. Whether the facts alleged constitute oppression is a question of law, which we decide independently. *Reget*, 242 Wis. 2d 278, ¶11.

¶20 Oppressive conduct against a minority shareholder is defined as "burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of the company to the prejudice of some of its members; or a visual departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts [the shareholder's] money to a company is entitled to rely." *Jorgensen v. Water Works, Inc.*, 218 Wis. 2d 761, 783, 582 N.W.2d 98 (Ct. App. 1998) (citation omitted). Oppression, particularly in a closely held corporation, includes "the frustration of the reasonable expectations of the shareholders." *Id.* at 783 n.10.[7]

¶21 To show that the director(s) acted oppressively, a shareholder must show injury resulting from the complained-of action that was primarily inflicted on the shareholder, not the corporation. *See Read v. Read*, 205 Wis. 2d 558, 570, 556 N.W.2d 768 (Ct. App. 1996) (noting that "a shareholder may not bring suit for actions accruing to the corporation" and affirming the dismissal of a complaint against controlling shareholders because the alleged conduct, if true, "means that resulting primary injury is to the corporation, not the individual stockholder bringing the suit"); *Notz v. Everett Smith Group, Ltd.*, 2009 WI 30, ¶22, 316 Wis. 2d 640, 764 N.W.2d 904 (stating that "a majority shareholder's self-dealing may result in injury that is primarily to the corporation"). "If the only direct injury

---

[7] "In the context of a close corporation, oppressive conduct [by] those in control is closely related to breach of the fiduciary duty owed to minority stockholders." *Jorgensen v. Water Works, Inc.*, 218 Wis. 2d 761, 783, 582 N.W.2d 98 (Ct. App. 1998). The plaintiff shareholders have filed a separate action against Carey alleging breach of fiduciary duty, which is not part of this appeal.

is to the corporation, then the right to bring the action belongs solely to the corporation." *Ewer v. Lake Arrowhead Ass'n*, 2012 WI App 64, ¶17, 342 Wis. 2d 194, 817 N.W.2d 465. Thus, when the injury is primarily to the corporation, the shareholder cannot bring direct claims to seek redress for that conduct and resulting injury. The shareholder's sole avenue for relief is to pursue a derivative action that complies with statutory requirements on behalf of the corporation. *Id.*, ¶18; *Rose v. Schantz*, 56 Wis. 2d 222, 230, 201 N.W.2d 593 (1972).

¶22    The few published cases addressing minority shareholder oppression claims provide some guidance as to the type of conduct that may constitute minority shareholder oppression, as well as the type of conduct that does not.

¶23    Cases in which appellate courts have identified conduct that may constitute minority shareholder oppression include the following. In *Jorgensen*, 218 Wis. 2d 761, this court ruled that the following facts warranted a trial on the plaintiffs' minority shareholder oppression claim: the plaintiffs were two of six original shareholders in a corporation; all six shareholders were originally directors and received monthly payments from the corporation, and one of the plaintiffs was in charge of management; and after disagreements arose among the shareholders, four shareholders voted both plaintiffs off the board of directors, the plaintiffs no longer had any role in managing how the corporation was run or how money was distributed, and monthly distributions that had been made to all of the shareholders were no longer made to the plaintiffs. *Id.* at 768-69, 783. Similarly, in *Northern Air Services*, 336 Wis. 2d 1, our supreme court acknowledged a minority shareholder oppression claim based on the claimant's removal as an employee, officer, and shareholder in the corporation by the other two shareholders. *Id.*, ¶¶11, 14, 17, 77. Finally, in *Notz*, 316 Wis. 2d 640, our supreme court ruled that a claim of minority shareholder oppression was supported

by the allegation that the majority shareholder directed the company to make expenditures for due diligence for a potential acquisition of another company that ultimately benefited only the majority shareholder, which acquired the company for itself, thus resulting in a "constructive dividend" to the majority shareholder. *Id.*, ¶¶2, 4, 38.

¶24 In all of these cases, the ground for the minority shareholder oppression claim was that the persons who controlled the corporation used their power to frustrate the reasonable expectations held by minority shareholders— either by cutting off income streams or influence that the minority shareholders reasonably expected to have in the company, or by directing the company to pay dividends to the majority shareholder that were not shared equally by minority shareholders.

¶25 By contrast, the leading case in which this court identified conduct that does not constitute minority shareholder oppression is ***Reget***, 242 Wis. 2d 278. In ***Reget***, this court dismissed the plaintiff's minority shareholder suppression claim, ruling that the following facts did not warrant a trial: the defendant shareholders did not maintain a market for the sale of the plaintiff's stock or offer to purchase his stock at a price he believed was fair; the corporation had not paid dividends to any of the shareholders, despite its cash-rich position; and five family members received compensation for their services that the plaintiff believed was excessive. *Id.*, ¶¶6-9.

¶26 As we next explain in detail, the plaintiff shareholders here do not allege that they ever had any role in managing the Brewery, that they were ever directors or employees of the Brewery, that they were ever denied distributions or dividends made to other shareholders, or that Carey and the Brewery squeezed

11

them out of whatever role they had as minority shareholders, as in *Jorgenson*, 218 Wis. 2d 761, *Northern Air Services*, 336 Wis. 2d 1, and *Notz*, 316 Wis. 2d 640. Rather, the plaintiff shareholders make allegations more like those rejected for failing to state a minority shareholder oppression claim in *Reget*, 242 Wis. 2d 278. We address their allegations as to each aspect of their minority shareholder oppression claim in roughly the order in which the allegations are stated in the complaint.

**Dividends**

¶27    The complaint alleges that Carey and the Brewery have not paid and refuse to pay dividends to shareholders beyond distributions sufficient to cover their S-corporation taxes associated with the Brewery's income.  The complaint alleges that this is so even though the Brewery is holding approximately $40 million in cash and cash equivalents, has recently generated large profits from annual net income of between $14 million and over $20 million, and has retained earnings of approximately $100 million, "with virtually no debt."  The complaint alleges that the plaintiff shareholders have been harmed by Carey and the Brewery's refusal "to distribute any … profits and reserves beyond the tax distributions that are specified in the Shareholders Agreement."

¶28    As we explain, these allegations fail to state a minority shareholder oppression claim because the plaintiff shareholders were put on notice when they first invested in the Brewery that no dividends would be paid to any shareholder except as authorized by the Board of Directors, and that the Brewery would, at most, try to make distributions to all shareholders sufficient to satisfy their tax obligations.  Thus, all shareholders were treated alike in this respect, consistent with the Brewery's obligation as stated to the plaintiff shareholders when they

purchased their shares, and the plaintiff shareholders had no reasonable expectations to the contrary.

¶29 The 1993 Private Placement Memorandum that was provided to prospective investors at the time of the initial stock offering stated that shareholders "will be entitled to dividends only as authorized by the Board of Directors," and "THERE CAN BE NO ASSURANCES THAT DIVIDENDS WILL BE PAID." In its summary of the investment risks, the Memorandum repeated that, "No assurance can be made as to the amount or timing of any dividends to shareholders of the [Brewery] or that dividends eventually will be paid." The Memorandum also stated that the Brewery agreed, pursuant to the terms of the Shareholders Agreement signed by the plaintiff shareholders, "to use its best efforts to make distributions to the shareholders in amounts sufficient to satisfy any tax obligations which the shareholders may incur attributable to income of the [Brewery]." That identical language is stated in the Shareholders Agreement.

¶30 The complaint alleges that the Brewery has since 1993 paid distributions to the minority shareholders sufficient to cover their taxes associated with the Brewery's income, consistent with the Brewery's obligation regarding dividends and distributions as explained above. The complaint does not allege that the Board of Directors authorized dividends beyond this obligation and that the Brewery failed to pay such dividends. The plaintiff shareholders fail to cite legal authority supporting the proposition that a corporation engages in oppressive conduct when the corporation has failed to pay shareholders distributions or dividends beyond what the corporation was obliged, or what the directors authorized the corporation, to pay. The case law suggests the contrary.

13

¶31 This court has explained that, "until the profits of a corporation are declared as a dividend, the shareholders have no right or title in them and such profits belong exclusively to the corporation. Rather than being used to pay dividends, corporate profits may be added to the assets of the corporation to use for other corporate purposes."[8] *Reget*, 242 Wis. 2d 278, ¶15 (citing *Franzen v. Fred Rueping Leather Co.*, 255 Wis. 265, 271-72, 38 N.W.2d 517 (1949)). In sum, the complaint's allegations about the Brewery's failure to pay dividends beyond the distributions sufficient to cover shareholders' tax obligations fails to state a claim of minority shareholder oppression.

**Withholding and misrepresenting facts**

¶32 The complaint generally alleges that Carey and the Brewery withheld and misrepresented information "regarding the Brewery and Defendants' intent with respect to Brewery matters." We discuss below the specific allegations that identify the facts allegedly withheld or misrepresented under the sub-topics to which those facts relate. To the extent that this allegation relates to conduct associated with the 2019 purchase of the plaintiff shareholders' shares, we discuss it below as pertinent to the complaint's securities fraud claim.

---

[8] The complaint alleges that Carey and the Brewery oppressed the plaintiff shareholders by using the Brewery's assets to establish and operate a distillery so as to "use up more Brewery cash that could otherwise be paid as distributions to shareholders." However, as explained in the text, the shareholders had no reasonable expectation that the Brewery would use any excess cash to pay larger distributions, and the Brewery had no obligation to do so. Thus, the complaint fails to allege any injury resulting from the Brewery's consistent payment of distributions sufficient to cover shareholders' tax obligations, regardless of how much cash the Brewery held or the other corporate purposes for which the Brewery used that cash.

We address the complaint's additional allegations about the distillery separately below.

**Carey's "autocratic control"**

¶33   The complaint broadly alleges that Carey is free to approve matters without holding a Board of Directors meeting or calling for a vote at shareholder meetings, because Carey is the sole director and sole majority shareholder and, therefore, has voting control and can approve matters unilaterally.[9]  The complaint alleges that Carey has told the minority shareholders that she desires "to have as much control as possible with as many options as possible for herself."  The complaint alleges in its concluding paragraph that the plaintiff shareholders are oppressed because they "have no say in the Brewery's operation."

¶34   To the extent that the allegations imply that this situation frustrates the plaintiff shareholders' reasonable expectations, the documentary record precludes such an inference.  That record establishes that, when the plaintiff shareholders first invested in the Brewery in 1993, they were fully apprised that, as the complaint also alleges, Carey would be the sole director and majority shareholder with controlling "say" in the Brewery's operation.

¶35   The 1993 Private Placement Memorandum that made the offering to investors states that Carey will be the president and director of the Brewery and will be "responsible for overall operation of the [Brewery], including sales and marketing."  The Brewery's Bylaws state that there will be one director and vest the president and director with broad authority over the operation and management of the Brewery.  Specifically, the Bylaws provide that the president shall:

---

[9] As examples, the complaint alleges that the Brewery made a loan to Carey and transferred brewery assets to the Sugar River Distillery, owned solely by Carey and her husband, without submitting these items for a vote.  We address the loan and the distillery, separately, below.

supervise and control all of the Brewery's business and affairs; appoint and determine the powers, duties, and compensation of the Brewery's agents and employees; "execute … all deeds, mortgages, bonds, stock certificates, contracts, lease, reports and all other documents or instruments … in the course of the [Brewery's] regular business"; and "shall perform all duties incident to the office of chief executive officer and such other duties as may be prescribed by the Board of Directors." The Bylaws provide that the Board of Directors: shall exercise all corporate powers and manage the Brewery's business and affairs; may authorize contracts and loans on behalf of the Brewery; and may amend the Bylaws.

¶36 The Memorandum also vests Carey with voting control. Specifically, the Memorandum calls for the issuance to investors of up to 20,000 voting shares and 20,000 non-voting shares at a price of $10 per share in 32 units of 625 voting shares and 625 non-voting shares each, and provides that Carey as the founder would be issued 25,000 voting shares. The Memorandum provides that, "Investors must purchase, minimally, One Unit consisting of 625 shares of voting stock and 625 shares of non-voting stock" for $12,500. The Memorandum states that, among other investment risks, investors' voting power is limited because of the requirement that shareholders purchase equal numbers of voting and non-voting shares, while Carey holds only voting shares.

¶37 Thus, when the plaintiff shareholders first invested in the Brewery, they had no reasonable expectation that Carey would act inconsistent with her broad authority and obligations as the sole director and majority shareholder. The complaint does not allege that the "complete autocratic control" exercised by Carey over the Brewery's operations has been inconsistent with the authority vested in her since 1993. Simply stated, consistent with the 1993 Private Placement Memorandum and the Brewery's Bylaws, since the plaintiff

16

shareholders first invested in the Brewery in 1993, they have not "had any say" in the Brewery's operation.

¶38    In addition, as alleged in the complaint and shown in the documents attached to the parties' pleadings, the Brewery "has consistently generated large profits" and built up approximately $40 million in cash and cash equivalents with no debt, and in 2019 the plaintiff shareholders sold for $2,071 per share some of the shares that they purchased in 1993 for $10 per share.  These allegations do not establish that Carey exercised her "autocratic control" either oppressively or contrary to the plaintiff shareholders' reasonable expectations that she would "operat[e] a profitable business" as provided in the Memorandum.

¶39    In sum, the complaint's allegations about Carey's autocratic control fail to state a claim of minority shareholder oppression.

**Self-dealing**

¶40    The complaint appears to also allege that certain decisions that Carey made and certain actions that Carey and the Brewery took constituted self-dealing that oppressed the plaintiff shareholders and caused them injury by increasing the value of Carey's shares or suppressing the value of their shares, to their detriment.  As we now explain, in each instance the complaint's allegations of self-dealing either allege conduct consistent with the Brewery's Bylaws and Private Placement Memorandum that were known to the plaintiff shareholders when they first invested in the Brewery in 1993, or allege injuries that are primarily injuries to the Brewery that cannot be the basis of a direct claim by shareholders.  We address each of the challenged decisions and actions in turn.

**Compensation and loans**

¶41    The complaint alleges that the Brewery has paid bonuses to Carey and her husband, that in 2008 Carey authorized a $170,000 loan to herself and her husband that was subsequently paid back, and that Carey has employed her daughter as the Brewery's staff architect.  However, the complaint provides no specific details beyond these conclusory allegations to permit the inference that the bonuses and daughter's salary have been disproportionate to the services provided by Carey and her husband and daughter, or that the bonuses, repaid loan, or daughter's salary caused any injury to the plaintiff shareholders so as to support an allegation of self-dealing in the form of excessive compensation.  In addition, the Brewery's Bylaws authorize the Board of Directors to establish reasonable compensation for directors and reasonable benefits for employees, and the complaint does not allege any unreasonable compensation or benefits.  The Brewery's Bylaws also authorize the Board of Directors to authorize loans, and the complaint does not allege that Carey did not authorize the $170,000 loan.

¶42    Not only does the complaint fail to allege excessive compensation to Carey and her family employees, but the plaintiff shareholders fail to cite legal authority supporting the proposition that such conduct, even if alleged, states a minority shareholder oppression claim.  *See* *Reget*, 242 Wis. 2d 278, ¶15 (explaining that paying some shareholders *excessive* compensation in bad faith could state a claim for breach of fiduciary duty to the other shareholders); *Jorgensen*, 218 Wis. 2d at 776 (same).

**Employee Stock Ownership Plan (ESOP)**

¶43    The complaint alleges that Carey unilaterally set up the Brewery ESOP in 2015, to "assure long-term operation of the Brewery as a locally-owned

brewery, that would be operated for the benefit of employees and the public and not necessarily for the benefit of the minority shareholders" and to enable Carey and her family to sell their shares "without selling the entire brewery for the benefit of all shareholders."

¶44 We address separately below the allegations directed at Carey's intent to keep the Brewery locally owned. The allegations directed at the benefit of employees and the public state a primary injury to the Brewery, to the extent that such benefits come at the Brewery's expense. As for the allegations that the ESOP provides a vehicle for Carey and her family to benefit at the plaintiff shareholders' expense, the claim seems to be that: (1) Carey and her family could sell their shares to the ESOP for high prices without the Brewery being sold to an outside buyer; and (2) while the plaintiff shareholders could also sell their shares to the ESOP, they would do so at lower prices than if all the shareholders sold their shares to an outside buyer. This claim is speculative and amounts only to the allegation that the plaintiff shareholders will not be able to obtain the price that an outside buyer would pay, but, as explained separately below, they have had no reasonable expectation of a sale to an outside buyer.

¶45 The complaint also alleges that Carey and the Brewery have "attempted to shift vast amounts of potential market value from the minority shareholders … perhaps to the ESOP's shares." However, the complaint does not allege that Carey and the Brewery have actually done so.

¶46 In sum, the complaint's allegations about the ESOP fail to state a claim of minority shareholder oppression.

**Distillery**

¶47 The complaint alleges that Carey unilaterally established the Sugar River Distillery, used Brewery assets and resources for the benefit of the distillery, and allowed Carey and her family to take ownership of the distillery when Carey had a conflict of interest.

¶48 More specifically, the complaint alleges that Carey told the shareholders at an annual meeting that the Brewery was working on establishing a distillery. The complaint alleges that Carey caused the Brewery to: pay the costs and expenses of developing plans for, acquiring assets for, registering for federal trademarks for, providing distillery training for Carey's husband for, and constructing on Brewery property a distillery; approve contracts for the lease of Brewery employees, utilities, and space for below market value; and provide raw material and products at cost. The complaint alleges that the Brewery makes beer and mash that are sold at cost to the distillery, and that Carey and the Brewery intend to use Brewery earnings to expand the Brewery's capacity to benefit the distillery. The complaint alleges that Carey continues to use Brewery profits to expand and purchase equipment for use in the distillery.

¶49 The complaint also alleges that Carey converted the distillery to a business owned by her and her husband, without consulting other shareholders, and subsequently explained to the shareholders that she did so because the Brewery could not legally own the distillery, a fact confirmed in the Wisconsin Department of Revenue correspondence attached to the Brewery's motion to dismiss. The complaint alleges that Carey took all of these actions related to the distillery at the Brewery's expense, despite the conflict of interest resulting from her ownership of the distillery, solely for the benefit of herself and her family.

¶50   The allegation that Carey took all of these actions to benefit herself "at the Brewery's expense," along with the allegations that the Brewery is "not fully compensate[d]" for its assets and resources used by the distillery, indicate that any injury resulting from those alleged actions was to the Brewery, not the shareholders.   Thus, the right to bring any claim based on these allegations belongs to the corporation, and cannot be the subject of a direct action by shareholders.  *See Ewer*, 342 Wis. 2d 194, ¶17 ("If the only direct injury is to the corporation, then the right to bring the action belongs solely to the corporation."). Beyond any alleged injury to the Brewery, the complaint does not allege that Carey's and the Brewery's actions related to the distillery adversely affected plaintiff shareholders' role in the corporation.   In sum, these allegations fail to state a claim of minority shareholder oppression.

**Nonprofit foundation and intent to operate Brewery for benefit of public**

¶51   The complaint alleges that Carey unilaterally caused the Brewery to use its staff and other resources to pursue her own personal interest in forming a charitable nonprofit foundation.   The complaint alleges that the foundation is called "Only in Wisconsin Giving, Inc." and that two of the foundation's three board seats are chosen by Carey's family.   The complaint alleges that the Brewery's resources have been used to set up the foundation and that Carey and the Brewery have said that they intend for the foundation to be the Brewery's "marketing arm."   The complaint alleges that Carey's actions concerning the foundation demonstrate her "intent to operate the Brewery for the benefit of the public" and to use the foundation "to acquire other minority shareholders' shares to retain her control of the Brewery."   The complaint also alleges that Carey and the Brewery intend to donate at least 5% to 10% of the Brewery's annual net income to the foundation, forcing the plaintiff shareholders "to donate their pro

21

rata share of the Brewery's income" to the foundation and "complicat[ing] the shareholders' personal tax situations."

¶52    These allegations fail to state a claim of minority shareholder oppression for at least the following reasons.  The complaint does not allege that the plaintiff shareholders are required to donate shares to the foundation.  Nor does the complaint allege that the Brewery's donations have prevented or will prevent the Brewery from making distributions sufficient to cover the plaintiff shareholders' tax payments.  That the donations complicate any shareholder's personal taxes is not oppression as defined in the case law cited above.

¶53    In addition, to the extent that the complaint alleges that Carey's use of Brewery assets to benefit the public, such as to support the foundation or "acquire additional lands and develop outdoor park space for the public," will decrease the Brewery's profits, the injury would be primarily to the Brewery and, therefore, cannot be the subject of direct claims by the shareholders.

**2019 purchase of plaintiff shareholders' voting shares**

¶54    The complaint alleges generally that Carey and the Brewery have tried to buy back voting shares to consolidate Carey's control of the Brewery.  The specific allegations regarding the 2019 purchase of some of the plaintiff shareholders' voting shares include the following.

¶55    The complaint alleges that Carey and the Brewery knowingly purchased some of the plaintiff shareholders' voting shares at below fair market value; that Carey and the Brewery based the purchase price on the 2017 ESOP valuation (which Carey and the Brewery disclosed); but that Carey and the Brewery did not provide the plaintiff shareholders, despite repeated requests, with

complete annual ESOP stock valuations reports. The complaint also alleges that Carey has received offers for her shares that greatly exceed what she and the Brewery paid for the plaintiff shareholders' shares, and has otherwise suggested that the value of the Brewery is significantly more than the ESOP valuation allegedly used to establish the purchase price of the plaintiff shareholders' shares. The complaint alleges that Carey and the Brewery applied a minority discount to the 2017 ESOP valuation so as to further reduce the price for the plaintiff shareholders' shares below fair market value while increasing the value of Carey's controlling shares; required that the plaintiff shareholders first sell their voting shares so as to consolidate Carey's control; and took other steps to ensure that Carey retains her majority control over voting shares.

¶56    The documents attached to the complaint and the Brewery's brief supporting its motion to dismiss show that the plaintiff shareholders purchased their shares in 1993 for $10 per share and sold some of them to the Brewery and the ESOP in 2019 for $2,071 per share. Most of the above-stated allegations concern the claim that the plaintiff shareholders received less than what they believed to be the fair market value for their shares when they sold them. As to that claim, the allegations fail to allege minority shareholder oppression because the plaintiff shareholders were free to not sell their shares at the price offered. Indeed, the same claim was rejected in *Reget*, 242 Wis. 2d 278, ¶¶6-9, 15 (dismissing plaintiff's minority shareholder suppression claim that the defendant shareholders did not maintain a market for the sale of the plaintiff's stock or offer to purchase his stock at a price he believed was fair).

¶57    Moreover, the plaintiff shareholders had no reasonable expectations of receiving the fair "market value" for their shares, because they were informed from the start that there would be no market for their shares. The Private

Placement Memorandum provided to the plaintiff shareholders in 1993 stated, "NO PUBLIC MARKET FOR THE STOCK NOW EXISTS OR IS LIKELY TO DEVELOP." The Memorandum also stated that, among other investment risks, "[t]here is no established market for the sale of the Stock" and that "transfer of the Stock will be severely restricted." The Memorandum stated, "Since its transferability is limited, it is clear that a public market in the Stock will never develop. The Corporation is under no obligation to establish a market for the Stock."

¶58     The remaining allegations concern the claim that Carey and the Brewery pursued the purchase of some of the plaintiff shareholders' shares to consolidate Carey's control of the Brewery. However, these allegations fail to allege minority shareholder oppression because, as explained above, Carey already had control over almost all aspects of the Brewery's business and operation, as the majority shareholder, president, and sole director. The complaint does not allege that the sale of some of the plaintiff shareholders' shares decreased their power as to those matters outside of Carey's control or requiring the shareholders' unanimous consent.[10]

¶59     In sum, the complaint's allegations about the 2019 purchase of some of the plaintiff shareholders' voting shares fail to state a claim of minority shareholder oppression.[11]

---

[10] As discussed separately below, the complaint alleges that amendment to the Shareholders Agreement requires a unanimous vote of the shareholders.

[11] To the extent that these allegations also pertain to the plaintiff shareholders' securities fraud claim, we address them further in our analysis of whether the complaint states that claim.

**Refusal to sell Brewery and intent to keep it locally owned**

¶60    The complaint alleges that Carey intends to keep the Brewery locally owned to prevent the plaintiff shareholders from benefitting from a sale of the Brewery to an outside buyer at a per share price greater than the price offered by Carey for their shares, which prevents the plaintiff shareholders from "realiz[ing] a fair return on their investment." The complaint alleges that Carey unilaterally amended the preamble to the Brewery's bylaws "to read that the Brewery intends to remain independent and locally owned, and that it would be operated (in part) for the benefit of the community."[12] The complaint alleges that this amendment signaled a shift from the initial focus on operating a profitable business for the benefit of the investors and frustrated the plaintiff shareholders' reasonable expectations "that they would receive fair value for their shares." These allegations fail to state a claim of minority shareholder oppression for at least the following reasons.

¶61    The documents attached to the pleadings refute the allegations that Carey's alleged intent to keep the Brewery independent and locally owned, and to operate it "in part" to benefit the community, frustrated the plaintiff shareholders' reasonable expectations. The Private Placement Memorandum that has been in place since 1993 states that the Brewery will "cultivate its image with a program of personal interaction intended to create a strong presence in the local market" and a strong connection between retailers and customers with "their local brewery." The Memorandum also stresses the importance of the "local food

---

[12] The Bylaws provide that the bylaws may be amended either by a majority of voting shares present at an annual or special shareholders meeting or by a majority of the Board of Directors.

cultures and strong local allegiance and support of local products collectively" to the Brewery's success. The Memorandum specifically notes the results of a market survey showing "a high level of consumer interest" in, and preference for, local beers, even at a higher price, "relative to the national brands." Thus, the plaintiff shareholders have been on notice from the start of the local focus and nature of the Brewery's operations and the importance of that local focus and nature to cementing community connections and to fostering local allegiance and commercial success.

¶62    In addition, the Memorandum states that Carey, as the founder, "is dedicated to producing a quality beer, establishing a mutually beneficial relationship with the [Brewery's] customers and operating a profitable business for the [Brewery's] investors." The complaint alleges that the Brewery under Carey's leadership has been profitable. The complaint does not allege that the Brewery was formed for ultimate sale to an outside buyer. That Carey indicated her intent to keep the Brewery locally owned is not inconsistent with her obligations as stated in the Memorandum.

¶63    The complaint's allegations about Carey's focus on keeping the Brewery locally owned fail to state a minority shareholder oppression claim for the following additional reason. To the extent that remaining locally owned may negatively affect the Brewery's profits and, as a result, the value of the plaintiff shareholders' shares, any primary injury is to the Brewery.

**Not party to Shareholders Agreement**

¶64    The Shareholders Agreement provides, "The Corporation agrees to require all future shareholders of the Corporation to execute this Agreement as a precondition to the issuance of Shares of capital stock in the Corporation." The

Private Placement Memorandum similarly states, "No one will be permitted to become a shareholder of the Corporation unless he or she becomes a party to the Shareholders Agreement." The complaint alleges that, despite the plaintiff shareholders' expectations to the contrary, Carey, her daughter, her daughter's trust, and the ESOP are not parties to the Shareholders Agreement, and that all other minority shareholders are subject to the "stock transfer restrictions" in the Agreement. The complaint points to the specific restriction that the Brewery has the right of first refusal, meaning it has the option to match the price offered by a third party to whom a shareholder wishes to sell shares. The complaint alleges that, as a result, Carey "is free to sell her shares to whomever she chooses at whatever price she can negotiate."

¶65 The plaintiff shareholders do not explain how the fact that Carey, her daughter, her daughter's trust, and the ESOP are not bound by this restriction injures them. Rather, even if all four were bound by the right of first refusal restriction, under the Shareholders Agreement, Carey as the controlling shareholder and sole director of the Brewery could choose for the Brewery not to exercise that right and all four could still sell their shares at whatever prices they chose. Thus, this allegation fails to state a claim of minority shareholder oppression.[13]

---

[13] Moreover, as to the ESOP, the complaint fails to state a claim of minority shareholder oppression as to this issue because the complaint alleges that there is a separate shareholders agreement between the Brewery and the ESOP that imposes restrictions on share transfers. The complaint does not allege that the ESOP is subject to restrictions different from those in the Shareholders Agreement to which the ESOP is not a party.

**Proposed amendments to Shareholders Agreement and other documents**

¶66  The complaint alleges that Carey proposed specific "oppressive changes" to the Shareholders Agreement that would "dilute" and "devalue" the plaintiff shareholders' shares, increase the value of Carey's controlling shares, and consolidate Carey and her family's control of the Brewery.  However, the complaint also alleges that an amendment to the Shareholders Agreement requires a unanimous vote of the shareholders, and does not allege that the proposed amendments were adopted.  Thus, this set of allegations regarding objectionable proposed amendments that are not in effect and which the plaintiff shareholders can keep from coming into effect fails to state a claim of minority shareholder oppression.

¶67  Similarly, the complaint alleges that Carey and the Brewery proposed to amend the articles of incorporation and other corporate documents to increase the number of authorized shares and authorize a stock split, but the complaint does not allege that these proposals were adopted.

**Refusal to follow Bylaws**

¶68  The complaint generally alleges that Carey and the Brewery repeatedly refused to follow the Bylaws regarding notice of shareholder meetings, agendas, and voting on issues, and refused to allow minority shareholders to vote "on corporate issues."  However, the complaint also alleges that Carey always held a majority of the voting shares, such that her vote on corporate issues, which as explained above require majority votes, controlled.  The complaint does not allege that Carey and the Brewery acted unilaterally on issues requiring unanimous votes, or on issues that are not within Carey's authority as the sole director and president.

28

Thus, the complaint's allegations about the refusal to follow the Bylaws fail to state a claim of minority shareholder oppression.

## II. Securities Fraud Claim

¶69 The plaintiff shareholders allege that Carey and the Brewery misrepresented and failed to disclose material facts when the Brewery and the ESOP purchased some of the plaintiff shareholders' voting shares in 2019, in violation of WIS. STAT. § 551.501(2). That statute provides that:

> It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly, to do any of the following:
>
> ….
>
> (2) To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading.

Sec. 551.501(2); *see also* WIS. STAT. § 551.509(2) (providing for civil liability for the sale of a security in violation of § 551.501(2)). To summarize the analysis that follows, the crux of the securities fraud claim is that, as a result of the alleged misrepresentations and omissions, the Brewery and the ESOP offered a purchase price that was allegedly below the shares' fair market value. The allegations as to the purchase of Eichhoff's and Speers' shares fail to state a claim because there is no allegation that Carey and the Brewery made any representation that the purchase price was based on the shares' fair market value. The allegations as to the purchase of Runyan's shares fail to state a claim because the purchase agreement explicitly provides that the price would be at or below fair market value.

29

¶70    Recall that in 1993 the plaintiff shareholders purchased voting and non-voting shares in the Brewery for $10 per share. According to the 2019 stock purchase agreements, the Brewery and the ESOP purchased some of the plaintiff shareholders' voting shares for $2,071 per share. The Brewery purchased some of Eichhoff's and Speer's voting shares, and the ESOP purchased some of Runyan's voting shares.

¶71    The Brewery argues that Runyan's securities fraud claim must be dismissed because Carey and the Brewery did not purchase Runyan's shares; the ESOP, which did purchase Runyan's shares, is not a defendant; and the complaint does not allege that Carey or the Brewery controlled the ESOP's purchase of Runyan's shares. The plaintiff shareholders argue that the complaint sufficiently alleges that the terms of the purchase were controlled by Carey and the Brewery. Specifically, the plaintiff shareholders rely on the allegation in the complaint that "[t]he Brewery, at Carey's direction, unilaterally determines when and whether voting shares it purchases from shareholders will be assigned to the ESOP or retained as treasury stock." We assume without deciding that this allegation suffices, and we proceed to address the issue of whether the complaint states a securities fraud claim as to all three plaintiff shareholders.

*A. Additional background*

¶72    As stated, the complaint alleges that Carey and the Brewery made untrue statements of material fact to the plaintiff shareholders or omitted material facts that Carey and the Brewery were required to disclose. Specifically, the complaint alleges as follows.

¶73    Carey and the Brewery set the purchase price of the shares at a discount based on a 2017 ESOP valuation, and disclosed the per share valuation

figure but not the valuation report despite the report having been requested by the plaintiff shareholders. The 2017 ESOP valuation, and the purchase price for the plaintiff shareholders' shares based on the valuation, were below fair market value in 2019. The requested ESOP valuation reports for the years 2017-20, which the plaintiff shareholders ultimately received in 2021, show that Carey and the Brewery provided inaccurate data and projections to artificially depress the value of the shares. Carey and the Brewery possessed facts, which they did not disclose, showing that the ESOP valuation "was most certainly far below fair market value." Specifically, Carey and the Brewery failed to disclose that "some time ago" Carey had received a third party offer of $100 million for 10% of Carey's shares in the Brewery, based on which Carey knew or should have known that the 2017 ESOP valuation was below fair market value.[14] As a result of Carey's and the Brewery's misrepresentations and omissions, the plaintiff shareholders sold their shares "at a value less than they would have" had they received true and complete information.

## B. Analysis

¶74 Because the stock purchase agreements for the purchase of Eichhoff's and Speer's shares contain the same language, and that language is different from the language in the agreement for the purchase of Runyan's shares,

---

[14] The complaint alleges that the most recent ESOP valuation values the Brewery at between $92.8 million and $113 million. However, the brief does not explain how the most recent ESOP valuation is relevant when the complaint alleges that the 2019 purchase price for plaintiff shareholders' shares was set at a discount based on the 2017 ESOP valuation. Moreover, the complaint alleges that Carey and the Brewery provided the 2017 ESOP valuation (which the complaint does not identify) to the plaintiff shareholders.

we will address first the Eichhoff and Speer transactions and then the Runyan transaction.

*Eichhoff and Speer Transactions*

¶75    The Eichhoff and Speer stock purchase agreements state in pertinent part:

> WHEREAS, the Seller is the owner of record of shares of voting stock of New Glarus ("the Stock"); and
>
> WHEREAS, the Seller desires to sell to New Glarus, and New Glarus desires to purchase from the Seller … shares of such Stock (the "New Glarus Shares");
>
> NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, and subject to and on the terms and conditions herein set forth, the parties agree as follows:
>
> ….
>
> 1.2 In payment for the New Glarus Shares, New Glarus shall pay to the Seller at the Closing, $2,071.00 per share, for the total sum of ….
>
> ….
>
> REPRESENTATIONS AND WARRANTIES OF NEW GLARUS
>
> New Glarus hereby represents and warrants to Seller as follows:
>
> 5.1 To the full extent required by the New Glarus Brewing Company Shareholders Agreement, New Glarus authorizes the sale of the New Glarus Shares to New Glarus.

As the circuit court notes, there is in the stock purchase agreements no language regarding the calculation of the purchase price and no reference to fair market value.

¶76 We assume as fact for purposes of this appeal, as we must on a motion to dismiss, the complaint's allegations that Carey and the Brewery knew that the 2017 ESOP valuation understated the Brewery's fair market value and set a purchase price below the shares' fair market value, and knowingly withheld information so showing. However, the complaint does not allege that Carey and the Brewery represented to Eichhoff and Speer that the purchase price was based on the fair market value of the Brewery or the shares. And, as the circuit court noted, there is no language in the stock purchase agreements signed by Eichhoff and Speer regarding the calculation of fair market value or tying that calculation to the purchase price. That is, there is no language in the stock purchase agreements, and no allegation in the complaint, stating that Carey and the Brewery represented to Eichhoff and Speer that the purchase price was pegged to fair market value. Thus, any misrepresentation or omission regarding fair market value was not material because there was no alleged or demonstrated representation that the purchase price was based on fair market value.

*Runyan Transaction*

¶77 The Runyan stock purchase agreement states in pertinent part:

> WHEREAS, the Seller is the owner of record of shares of voting stock of New Glarus ("the Stock"); and
>
> WHEREAS, the Seller desires to sell to the ESOP Trust, and the ESOP Trust desires to purchase from the Seller … shares of voting Stock (the "ESOP Shares");
>
> NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, and subject to and on the terms and conditions herein set forth, the parties agree as follows:
>
> ….

1.2 In payment for the ESOP Shares, the ESOP Trust shall pay to the Seller at the Closing $2,071.00 per share, for the total sum of ….

1.3 The parties intend that the ESOP Trust not pay more than adequate consideration as of the Closing date, as defined in Section 3(18) of the Employer Retirement Income Security Act of 1974, as amended (the "Act")[15] or Section 2510.3-18 of the Department of Labor Proposed Regulations. Accordingly, the share price for the shares being purchased pursuant to this Agreement is based upon the fair market value of the Stock as determined by an appraisal of New Glarus by Capital Valuation Group, Inc.

.…

REPRESENTATIONS AND WARRANTIES OF NEW GLARUS

New Glarus hereby represents and warrants to Seller and ESOP Trust as follows:

5.1 To the full extent required by the New Glarus Brewing Company Shareholders Agreement, New Glarus authorizes the sale of the ESOP Stock from Seller to the ESOP Trust.

---

[15] The *United States Code*, Employee Retirement Income Security Program, Protection of Employee Benefit Rights, Title 29, § 1002(18) provides:

The term "adequate consideration" when used in part 4 of subtitle B [29 U.S.C. §§ 1101 et seq.] means (A) in the case of a security for which there is a generally recognized market, either (i) the price of the security prevailing on a national securities exchange which is registered under section 6 of the Securities Exchange Act of 1934 [15 U.S.C. § 78f], or (ii) if the security is not traded on such a national securities exchange, a price not less favorable to the plan than the offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of any party in interest; and (B) in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary.

29 U.S.C. § 1002(18) (2022). All references to the U.S.C. are to the 2022 version.

34

¶78 Pertinent here, the Runyan stock purchase agreement differs from the Eichhoff and Speer stock purchase agreements by including Section 1.3. Section 1.3 provides that the purchase price for Runyan's shares is related to a fair market determination ("based upon the fair market value of the Stock as determined by an appraisal of New Glarus by Capital Valuation Group, Inc."). Section 1.3 also provides that the parties intended that the ESOP Trust "not pay more than adequate consideration" for the shares. The federal statute referenced in Section 1.3 defines "adequate consideration" differently depending on whether there is a "generally recognized market" for the shares. 29 U.S.C. § 1002(18).

¶79 As explained in ¶57 above, the Private Placement Memorandum provided to the plaintiff shareholders in 1993 states in at least three places that no public market for the sale of the Brewery shares exists or will ever develop. And the complaint does not allege that a public market had developed or existed at the time that the ESOP purchased Runyan's shares. Thus, the definition of adequate consideration that applies here is the definition that applies to "an asset other than a security for which there is a generally recognized market." 29 U.S.C. § 1002(18). That provision defines adequate consideration as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan." 29 U.S.C. § 1002(18).

¶80 Apparently consistent with this statutory provision, the stock purchase agreement provides that the purchase price is based on "the fair market value of the Stock as determined by an appraisal of New Glarus by Capital Valuation Group, Inc." Also apparently referring to this provision, the complaint alleges that Carey and the Brewery set a purchase price below the shares' fair market value—and, therefore, below "adequate consideration"—and knowingly withheld information so showing.

¶81   However, this allegation disregards the concomitant stated intention of the parties that the ESOP will "not pay more than," meaning will pay equal to or less than, "adequate consideration." In other words, even if the Brewery's fair market value was higher than the purchase price for Runyan's shares, as alleged in the complaint, the parties intended only that the purchase price be equal to or less than that value. As alleged in the complaint, the purchase price was less than market value. Thus, the allegations in the complaint that the purchase price was knowingly set by Carey and the Brewery at less than fair market value do not establish any claim for relief because the stock purchase agreement reflected Runyan's agreement that the purchase price could be less than fair market value and, more specifically, could be the amount stated in the stock purchase agreement. Accordingly, the securities fraud claim fails to state a claim.[16]

### III.  Carey's Arguments

¶82   Our conclusions that the complaint fails to state claims of minority shareholder oppression or securities fraud dispose of this appeal. However, for the sake of completeness, we briefly summarize the parties' arguments regarding the primary issue that only Carey raises, focusing on the relief sought in the complaint. Carey argues, and the circuit court concluded, that the complaint must be dismissed because it seeks relief that WIS. STAT. § 180.1430 does not authorize.

---

[16] To support their securities fraud claim as to all three transactions, the plaintiff shareholders cite isolated language from three federal court opinions. However, those cases are neither helpful nor persuasive in guiding our analysis of the representations and omissions alleged here. *See Kohler v. Kohler*, 319 F.2d 634, 63-40, (7th Cir. 1963) *abrogation recognized by Sec. & Exch. Comm'n v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) (rejecting after a court trial a securities fraud claim based on omitted information about the accounting treatment of pension costs); *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 982 (W.D. Wis. 2003) (addressing disclosure of information to correct representations that were made).

Specifically, Carey argues that the statute authorizes the court to order dissolution only and the complaint states that it does not seek dissolution; in addition, Carey argues that dissolution is not available against her.

¶83     WISCONSIN STAT. 180.1430 provides:

180.1430 **Grounds for judicial dissolution**.  The circuit court … may dissolve a corporation in a proceeding:

….

(2) By a shareholder, if any of the following is established:

….

(b) That the directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent.

¶84     The complaint asks that the circuit court order, in the exercise of the court's "equitable powers," that Carey and the Brewery acquire the minority shareholders' shares at fair value, the appointment of an independent Board of Directors, and that all non-voting shares be reclassified as voting shares.  The complaint expressly states that it does not seek dissolution of the Brewery.

¶85     Carey argues that dissolution is the only permissible relief for oppression and that the statute's use of the word "may" means only that the court may choose not to order dissolution even when the shareholders make the required showing, citing *Dickman v. Vollmer*, 2007 WI App 141, ¶27 303 Wis. 2d 241, 736 N.W.2d 202 ("[D]issolution does not automatically result even upon proper proof.  Dissolution is discretionary."); *see also **Jorgenson***, 218 Wis. 2d at 783 n.11 (reversing summary judgment dismissing the plaintiffs' minority shareholders oppression claim based on the existence of material disputed facts and noting that the court's decision "should not be read as requiring the court to

grant dissolution if the [plaintiffs] establish oppressive conduct …. We do not decide whether or under what circumstances a trial court must dissolve a corporation if a statutory ground is established"); *cf.* WIS. STAT. § 180.1833(2)(a) (authorizing remedies other than dissolution as a remedy for oppressive conduct in a statutory close corporation), and WIS. STAT. § 181.1430(2)(a) and (b) (requiring the court to consider "[w]hether there are reasonable alternatives to dissolution" and whether "dissolution is the best way of protecting the interests of members" before dissolving a nonstock corporation).[17] Carey concludes that, because the statute authorizes only dissolution upon a showing of shareholder oppression or fraud and the complaint affirmatively states that it does not seek dissolution, the complaint fails to state a claim for relief.

¶86 The minority shareholders counter that Wisconsin courts have implicitly acknowledged the availability under the statute of alternative, less drastic forms of relief to meet the needs of a particular case, precisely because of the use of the word "may" and the court's broad discretionary authority in what is an equitable proceeding, citing *Northern Air Services Inc., v. Link*, No. 2008AP2897, unpublished slip op. ¶24 (WI App Jan. 18, 2012) (stating that "dissolution … is one of many potential remedies for oppression …. The circuit court could have required [the defendants] to turn over complete ownership in the company to [the plaintiff], or fashioned some other equitable remedy."). *See also* *Gull v. Van Epps*, 185 Wis. 2d 609, 626-27, 517 N.W.2d 531 (Ct. App. 1994) (actions under the judicial dissolution statute are proceedings in equity); *Mulder v. Mittelstadt*, 120 Wis. 2d 103, 116, 352 N.W.2d 223 (Ct. App. 1984) (In an

---

[17] The cited statutes do not apply here because the Brewery is neither a statutory close corporation nor a nonstock corporation.

equitable proceeding, "[i]f the customary forms of relief do not fit the case, or a form of relief more equitable to the parties than those ordinarily applied can be devised, no reason is perceived why it may not be granted"). In addition, the minority shareholders argue that, regardless of how the statute is interpreted, the relief requested in a complaint may not be considered to determine whether the complaint states a claim.

¶87 We need not, and do not, resolve these disputes given our conclusion that the complaint's factual allegations, separate from the request for relief, do not state a claim. *See **Barrows v. American Fam. Ins. Co.**, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").[18]

## CONCLUSION

¶88 For the reasons stated, we conclude that the circuit court properly dismissed the complaint alleging claims of minority shareholder oppression and securities fraud for failure to state a claim for which relief may be granted.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[18] For the same reason, we do not reach the ancillary issues argued by Carey regarding whether the plaintiff shareholders are barred from now seeking dissolution and whether dissolution is available against Carey.